**SHELCO, INC., et al., Plaintiff,**
**v.**
**The DOW CHEMICAL COMPANY et al.,**
**Defendants.**

**SHELCO, INC., et al., Plaintiff,**
**v.**
**BOYLE–MIDWAY, INC., et al.,**
**Defendants.**
**Nos. 67 C 1393, 67 C 2190.**

United States District Court,
N. D. Illinois, E. D.
Sept. 23, 1970.

Anderson, Luedeka, Fitch, Even & Tabin, Chicago, Ill., for plaintiff.

Merriam, Marshall, Shapiro & Klose, Chicago, Ill., for defendant Dow Chemical and others.

Molinare, Allegretti, Newitt & Witcoff, Chicago, Ill., for defendant Boyle-Midway and others.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

AUSTIN, District Judge.

### THE PARTIES, ISSUES, AND JURISDICTION

1. Plaintiff, Shelco, Inc., is a Massachusetts Corporaion having its principal place of business at Wellesley Hills, Massachusetts. Plaintiff, The Shelco Company, is a Delaware corporation having its principal place of business at Wellesley Hills, Massachusetts. The Shelco Company is a wholly-owned subsidiary of The Clorox Company, an Ohio corporation authorized to do business in Illinois. (Pl. Pretrial Brief 7)

2. On December 4, 1969, The Shelco Company acquired substantially all of the assets of Shelco, Inc., including the right, title, and interest in U.S. Patent No. 3,335,092 (the patent in suit). Shelco, Inc. was the owner of the patent in suit prior to December 4, 1969. (Pl. Pretrial Brief p. 7) Shelco, Inc. was the sole plaintiff until January 14, 1970, when, on plaintiff's motion, The Shelco Company was joined as a party plaintiff on condition that it be bound by all proceedings in the case with the same force and effect as they are applicable to Shelco, Inc. (9–10). The Shelco Company also agreed in open court to assume any liabilities of Shelco, Inc. arising from this case (18–19). Hereinafter, unless otherwise indicated, the plaintiffs will be referred to as "Shelco."

3. Shelco, Inc. became the owner of the patent in suit by way of an assignment from Winfield Brooks Company, Inc., the assignee of the patentee, Kenneth E. Perry (Pl. Pretrial Brief 7). There is a continuing relationship between Shelco, Winfield Brooks, and Mr. Perry, as follows: Mr. Perry is the President of and owns the controlling interest in Winfield Brooks, and he is a Director of and, through Winfield Brooks, owns approximately 35% of Shelco, Inc. (811, 1082, 1127–29). Winfield Brooks makes and Shelco sells the oven cleaner ("Jifoam") which is the commercial embodiment of the Example of the patent in suit. (1087, 1092, 1302; Stipulated Statement of Uncontested Facts p. 3).

4. Defendant, The Dow Chemical Company, (hereafter "Dow") is a Delaware corporation having a regular and established place of business in Chicago, Illinois. Defendant Harry G. Schierholz & Co. (hereafter "Schierholz"), is an Illinois corporation having a regular and established place of business in Chicago, Illinois.

5. On August 10, 1967, Shelco, Inc. filed a complaint (C.A. No. 67 C 1393) charging Dow and Schierholz with infringement of U.S. Patent 3,335,092, entitled "Oven Cleaner and Method of Using the Same." Dow is the manufacturer of an oven cleaner ("Dow All New Oven Cleaner") charged to infringe this patent and Schierholz is Dow's distributor for this oven cleaner in the Chicago area.

6. On December 21, 1967, Shelco, Inc. filed a complaint (C.A. No. 67 C 2190) charging defendants Boyle-Midway, Inc. (hereafter "Boyle-Midway") and American Home Products Corporation (hereafter "AHP") with infringement of the same patent by manufacture and sale of Boyle-Midway's "Easy-Off" oven cleaner).

7. All defendants have filed counterclaims seeking a declaration of invalidity of the patent and attorneys' fees and Dow has further counterclaimed for treble damages under the antitrust laws.

8. This Court has jurisdiction of the parties and subject matter. Venue in this District is proper.

9. By order of October 1, 1969, C.A. Nos. 67 C 1393 and 67 C 2190 were consolidated for trial on the sole issue of validity of the patent in suit.

## THE PATENT IN SUIT

10. On December 4, 1963, Kenneth E. Perry filed his original application for the patent in suit (DX 74). A first revised application was filed July 6, 1964 (DX 75) and a second revised application was filed on August 26, 1965 (DX 76). The August 26, 1965 application matured into U.S. Patent 3,335,092 on August 8, 1967 (DX 77).

11. The patent relates to a composition for cleaning ovens, grills, and similar surfaces and to a method for applying the composition. Dow and Schierholz are charged with infringement of composition and method claims, specifically Claims 1–6, 14, 16–19, 26, and 28–32. American Home Products and Boyle-Midway are charged with infringement of the same claims with the exception of 31 and 32. (Stipulated Statement of Uncontested Facts, p. 3; Pl. Pretrial Brief, p. 10).

12. The sole composition example of the patent in suit reads:

"EXAMPLE

| Ingredient: | Proportion, per cent |
|---|---|
| NaOH (in the form of a 50% solution or 50° Baume) | [1] 3.0 |
| Ammonium salt of the sulfate ester of an alkylphenoxy polyoxy ethylene ethanol, sold under the trade name Alipal CO-436 by Antara Chem. Co. (surfactant) | 1.0 |
| Sulfonate surfactant sold under the trade name Benax 2A1 by Dow Chemical Co. | 0.1 |
| Propylene glycol | 20.0 |
| Furfuryl alcohol | 1.4 |
| Tetrahydrofurfuryl alcohol | 0.7 |
| Water (including water of NaOH solution) | 73.8 |

1. Exclusive of water in solution."

Mr. Perry, the inventor, summarized his invention as being:

"the development of the best oven cleaner on the market that could be— that was basically a safe aqueous caustic oven cleaner applied to a hot oven through an aerosol can, gaining the benefits both of the ingredients and the application through an aerosol can, * * * " (1249)

13. The composition claims, broadly, call for a liquid oven cleaner for application as a spray to a hot oven, consisting essentially of water in an amount of over 50% by weight of the composition, and an alkali metal hydroxide in an amount of from 1–10% of the composition packaged in an aerosol container with a propellant (e. g. Claim 16). Both sodium hydroxide and potassium hydroxide are classified as alkali metal hydroxides (51, 1254–55).

14. Certain narrower claims specify that the alkali metal hydroxide be sodium hydroxide in an amount of 3% and further call for the presence of any amount of a humectant and any amount of a surfactant (e. g. Claim 28).

15. A humectant, in the context of this patent, is a substance used to retard evaporation of the composition. (DX 77, Col. 3, lines 41–44; 59; 3358; 3385–86). No specific amount of humectant is specified by any of the claims. The specification says the amount of humectant may be as little as 1% or may be omitted altogether. (DX 77, Col. 3, lines 53–56, 70–73). The humectant can be either a glycerol (a polyhydric alcohol known commercially as glycerine), a glycol (an alcohol having two hydroxyl groups), or any alcohol having more than two hydroxyl groups. (DX 77, Col. 3, lines 41–44; 60–65; 1623–24; DX 624; 3351–55).

16. The term "surfactant" is a shorthand term for a surface active agent (39). In the context of this patent, a surfactant is a wetting agent (40; 2373). The surfactant can be one (or more) selected from the groups classified as anionic (carrying a negative charge in solution), cationic (carrying a positive charge in solution), or nonionic (carrying a neutral charge in solution) (65–66; DX 77, Col. 3, lines 62–70). No specific amount of surfactant is called for in any of the claims, nor in the specification. (DX 77, Col. 4, lines 3–6).

17. The method claimed by the patent is to spray the composition on a hot oven, leave the composition on the hot oven for an interval of time, and then remove the composition (e. g. Claim 1). Some claims state that the oven should be at a

temperature of at least 140° F. (e. g. Claim 6).

18. While both the composition and method claims refer to the composition as being sprayed from an "aerosol container" by a "propellant," the patent specification states that the "same results were achieved by spraying the cleaner * * * on a hot oven with a conventional pressure atomizer" (DX 77, Col. 3, lines 38–40).

19. In the patent in suit, the reduced caustic (3%) is said to have the advantage of making the cleaner safer, less corrosive, and easier to store (Col. 1, lines 48–52; Col. 2, lines 3–5). The spray is said to make the cleaner less messy to apply and easy to remove (Col. 1, lines 44–48; Col. 2, lines 14–17). The application to a hot oven is said to be more convenient in that the oven may be cleaned without waiting for it to cool (Col. 2, lines 63–67), and the elevated temperature speeds the reaction to the point where the cleaning can be done in 5 to 20 minutes, a fraction of the time required by paste cleaners (Col. 2, lines 50–56; 18–26). It is to be noted that while the patentee says that heat is essential to his invention (1318; 1325–26) Shelco maintains, under oath, that the composition is covered by the patent claims whether used on a hot or cold surface (Pl.'s Ans. to Interrog. 79.10, 805).

20. In written arguments and sworn affidavits submitted to the Patent Office during the pendency of Perry's third application, Perry made the following statements:

"This demonstrates the deep-seated opinion of those skilled in this art prior to applicant's invention that (1) caustic oven cleaners should, under no circumstances, be applied to a *hot* oven and (2) the aerosol packaging of aqueous solutions of sodium hydroxide for oven cleaning was too hazardous to be acceptable, two misconceptions which applicant proved to be untrue." (DX 76, p. 89)

\* \* \* \* \* \*

"However, recently, after JIFOAM [Perry's oven cleaner] disproved the prevailing belief of those skilled in the art that (1) aerosol packaging of aqueous solutions of sodium hydroxide is too hazardous and (2) *applying a caustic solution to a hot oven is too hazardous,* \* \* \*" (emphasis added) (DX 76, p. 91)

\* \* \* \* \* \*

"Thus, after applicant had disproved the prevailing beliefs that aerosol packaging of aqueous solutions of sodium hydroxide for oven cleaners was too hazardous to be practical and that application of alkaline oven cleaners to a hot oven was also too hazardous, \* \* \*" (DX 76, p. 94)

\* \* \* \* \* \*

"In achieving this commercial success, it was necessary to overcome the prejudices of those skilled in this art, as evidenced by the Consumer Reports, against aerosol packaging of aqueous sodium hydroxide oven cleaners and against application of alkaline oven cleaners to a hot oven." (DX 76, p. 96)

\* \* \* \* \* \*

"So far as I know, I am the first to have thought of aerosol packaging a sodium hydroxide-water or sodium hydroxide-water-glycol oven cleaner and am the first to have thought of applying such aerosol oven cleaner to a hot oven at a time when others in this field were of the opinion that it would be dangerous and unsatisfactory to do either." (DX 76, p. 94)

21. Although Perry's testimony, continuing his approach before the Patent Office, contends for a very broad scope of invention, the advance over the prior art now asserted by Shelco is that Mr. Perry was the first to teach that an *aqueous solution* oven cleaner with *reduced caustic* (less than 10% free alkali metal hydroxide) and a *large percentage* (20%) of propylene glycol could be stored in aerosol *metal cans* and *sprayed* on a *hot* oven to produce a *foam* which would achieve quick, effective, and safe

cleaning. (21–32; Pl. Pretrial Brief 3–5, 16–24). This is considerably narrower than the position urged on the Patent Office and the patent's broad assertion that the advance was over prior art oven cleaners which were applied as thick, messy pastes having a high (10%) free alkali metal hydroxide content and which were all applied to cold ovens (Col. 1, lines 20–43; Col. 2, lines 3–17). It is also considerably narrower than the claim language which, for example, does not speak of metal aerosol cans, nor foam, nor any proportion of humectant or propylene glycol, nor, in many cases, even a reduced caustic.

22. Without a surfactant, an aqueous caustic in an aerosol container with a propellant will not foam or adhere to a hot oven wall. (Lover 2165–2166). Most of the claims of the Perry patent do not call for the use of a surfactant (the foaming agent). (Claims 1, 3, 4, 7, 8, 9, 11, 12, 13, 14, 16, 17, 18, 20, 21, 22, 24, 25, 26, 29, and 30). Mr. Perry, the inventor, echoing his Patent Office arguments, testified:

"Q. Then a 3 percent aqueous caustic, with an aerosol can, applied to a hot oven is within your invention?

\* \* \* \* \* \*

"A. In the broad claims, it would be so, sir." (Perry 1341).

Hence the term "spraying" found in the method claims is not limited to the spraying of a foam but was intended to cover any form of spray. That this was the intention of the inventor is shown by the statement in the patent that "The same results were achieved by spraying the cleaner of the example on a hot oven with a conventional pressure atomizer." (Col. 3, lines 38–40). There are frequent references in the patent to "spray or foam" (e. g., Col. 5, line 59) which only confirm the broad intended meaning of the term "spraying" found in the method claims.

23. From the above findings, it is apparent that in its examination of the prior art the court must look primarily

for art teaching the use of freely flowing aqueous solutions of free alkali metal hydroxides in amounts not more than 10% by weight that were suitable for spraying on a hot oven. In view of Findings 21 and 22, the vehicle by which the spray is dispensed is not critical; nor is the form of the spray (that is, whether it foams). With respect to the narrow claims, the Court, in addition, must look for the presence of a surfactant and a humectant, though the amount of either is immaterial. With respect to the humectant, the Court must further look for the use of glycols, glycerols or other polyhydric alcohols as the humectant and, with respect to two claims (31, 32) it must look for the use of propylene glycol as the specific humectant, though in no particular percentage. In view of the absence of any teaching in the patent that a high percentage (such as 20%) of propylene glycol functions as a particular safening agent, or that propylene glycol serves this function better than any other humectant specified in the patent, the prior art, contrary to Shelco's contention, need not be examined for this teaching. The prosecution history of the Perry patent also casts light on the scope of inquiry into the prior art necessary for resolving the issues herein.

PERRY'S ORIGINAL APPLICATION; HIS TWO REVISED APPLICATIONS; AND HIS CANADIAN AND GREAT BRITAIN APPLICATIONS

24. While the scope of the prior art to be looked for has been defined by Finding 23, the Court must also determine the effective filing date for the claims in issue; that is, the cut-off date for "prior" art. The prosecution history of the Perry patent casts light on this factor.

25. On June 4, 1963, Perry made a disclosure of his oven cleaner formula to his patent attorney. (DX 63) The disclosure stated:

"For the oven cleaner, the ratio of tetrahydrofurfuryl alcohol and furfuryl alcohol is essential. It can be

varied somewhat but *neither can be eliminated or replaced with like alcohols."* (Emphasis added).

26. On December 4, 1963 Perry's patent attorney filed Perry's first application for patent (DX 74, pp. 1–15), serial 328,114. The first seven claims of the ten claims of the original application, as filed (DX 74, pp. 13, 14) were limited to an over cleaner composition which included a catalyst designated as furfuryl alcohol and tetrahydrofurfuryl alcohol. The remaining three claims were limited to a method of using the oven cleaner composition having the catalyst defined in the first seven claims. In other words, each claim of Perry's original application contained the limitation to furfuryl alcohol and tetrahydrofurfuryl alcohol. The claims were appropriately and necessarily drawn in this limited way in view of Perry's communication to his attorney *disclosing his invention.*

27. Perry's disclosure further specified his invention and taught the necessity of the furfuryl alcohols in his oven cleaner:

"The present invention is *based* on the surprising discovery that a mixture of furfuryl alcohol and tetrahydrofurfuryl alcohol *catalyzes and enhances the cleaning action of the sodium hydroxide,* especially at elevated temperatures, *to such a great extent that the amount required can be reduced to less than ⅓* and such reduced amount has a markedly greater and faster cleaning power." (DX 74, p. 3, lines 21–27) (emphasis added)

\*    \*    \*    \*    \*    \*

28. On April 20, 1964, more than one year after the sale to Vaughn Electric, Kenneth E. Perry filed an amendment to his original application, Serial No. 328,-114 adding a new Claim 11 which was not restricted to an oven cleaner composition containing the *catalyst.* (DX 74, p. 16) Claim 11 reads:

" \*  \*  \* A method of cleaning ovens comprising spraying on the oven while it is hot, a composition in the form of a foam and containing as an essen-

tial ingredient, an alkali metal hydroxide, leaving said composition on the hot oven for an interval of time and wiping the composition off said oven." (DX 74, p. 16)

This claim was rejected by the Patent Office on April 2, 1965 "as failing to point out the invention in the methods claimed, since the *necessary* furfuryl-tetrahydrofurfuryl alcoholic mixture has not been set forth". (DX 74, p. 19, paragraph 7). (Emphasis added) Perry abandoned this original application without response. (DX 74, p. 21).

28a. Perry filed a first revised application (DX 75) on July 6, 1964 in order to get the broadened disclosure of new claim 11 under oath. (DX 75, p. 15). The Patent Office, in the first revised application, believed that claim 11 was still faulty:

"7. Claims 11–13 are rejected as indefinite and as failing to point out the alleged invention since the necessary hydrofurfuryl-tetrahydrofurfuryl alcoholic mixture has not been set forth." (DX 75, p. 19, March 2, 1965).

In response to this rejection, Perry directly misrepresented a critical fact:

"Original claim 11 has been incorporated into the specification. *Such original claim was a part of the original disclosure."* (DX 75, p. 33)

29. In subsequent arguments in Perry's first and second revised applications before the United States Patent Office and in companion cases before the Canadian and Great Britain Patent Offices, Mr. Perry argued that the "broad concept" of his invention—not limited to the use of the catalyst—was first disclosed on the date he filed Claim 11, April 20, 1964, which was more than one year after the sale of his oven cleaner. For example, on August 23, 1966 the Canadian Patent Office rejected all claims in the corresponding Canadian application (originally identical to the U.S. application, as amended by the addition of Claim 11), which were not limited

to the use of the furfuryl-tetrahydrofurfuryl alcohol catalyst:

> "According to the disclosure page 3, lines 21 to 27, the invention of the present application is *based on* the use of a mixture of furfuryl and tetrahydrofurfuryl alcohols, which *catalyzes* and enhances the cleaning action of the sodium hydroxide at elevated temperatures. (Emphasis added)
>
> Therefore claims 1, 12, and 13 are rejected as not being supported by the disclosure and must be cancelled." (DX 608, p. 417)

30. Perry argued that the disclosure of claim 11 (which was filed with the original Canadian Application but was not included in the U.S. application until the amendment of April 20, 1964— more than one year after a sale of Perry's invention) provided disclosural support for the non-catalyst claims:

> "This *broad concept* of applicant's invention is clearly set forth in *claim 11* as originally filed with the application, with no reference being made therein to the presence of a catalyst in the cleaning composition. This broad concept of the invention and applicant's intent to claim the matter broadly is all the more clearly realized upon reference to originally filed claim 12, [not in original U.S. application, until amendment of April 20, 1964), which is dependent upon *claim 11* but further recites the presence of the catalyst in the broad cleaning composition of *claim 11*. This is a crystal clear teach-

ing that the invention is not limited to the presence of the catalyst. It is also clearly stated on page 11 of the original disclosure that the invention *is not limited to the description of the specification* but only to the compositions and methods *claimed* in the *claims*, among which is *claim 11*. Thus, when the original disclosure is viewed as a whole, which it must be, it discloses that the invention in its broadest aspect does not require a catalyst and that use of such catalyst is a narrower aspect of the invention as is the use of the humectant." (DX 608, pp. 412, 413) (Material in brackets added) (Emphasis added)

\* \* \* \* \* \*

> "Thus the catalyst merely enhances and improves the overall broad inventive concept. In order to distinguish between the broad aspect (as per original claim 11) and the narrower aspect (the use of catalyst and/or humectant) of the inventive concept this paragraph [of the Canadian disclosure] has been amended to refer to such narrower aspect as a part of the invention." (Emphasis added) (DX 608, pp. 413, 414) (Material in brackets added)

31. The earliest effective filing date to which Perry is entitled for the broad non-furfuryl alcohol limited claims (all of the claims here in issue) is not December 4, 1963, the date of his first application, but April 20, 1964, the date on which claim 11 was added to the first application.[1]

---

1. On June 25, 1969, this Court denied a Motion For Summary Judgment under 35 U.S.C. § 102(b) based on the sale of 1200 cans of Perry's oven cleaner to Vaughn Electric Company (DX 58; 821; DX 82) more than one year prior to the April 20, 1964 date. This Court was of the view, at that time, that Perry was entitled to the December 4, 1963 date for all claims in his patent. Evidence subsequently received during the trial of this case shows that the April 20, 1964 date is the correct one.

The Plaintiff, in response to the Motion For Summary Judgment filed by AHP and Boyle-Midway, quoted the sworn tes-

timony of Mr. Perry taken during his pretrial deposition:

"Q. Did you understand at the time you signed this oath [accompanying the original Perry application filed December 4, 1963] that you had to have a furfuryl alcohol in your material for your invention?

"A. I don't believe I understand it had to be that. It was preferred." (Pl's. brief, p. 12.)

On Motion For Summary Judgment, Mr. Perry's sworn testimony was entitled to full credit as that of one skilled in the art. As of the time of the Motion For Summary Judgment, Mr. Perry had

## PRIOR ART PATENTS

32. The patent in suit relates broadly to the art of cleaning compositions and, specifically to compositions for cleaning cooking residue from ovens. Prior art cleaning compositions have traditionally utilized an alkali as their active (cleaning) ingredient. (40–41) Alkalis are basic substances which are characterized by the predominance of hydroxyl ions (OH=) when dissolved in water, as opposed to acidic substances which are characterized by the predominance of hydrogen ions (H+). The presence of these ions can be detected and expressed on a scale known as the pH scale wherein "7" indicates neutrality; "7" to "14", increasing alkalinity; and "7" to "0", increasing acidity. (47–48) The most commonly used alkali is sodium hydroxide (NaOH), but other alkalis, such as potassium hydroxide (KOH) or sodium metasilicate, (alone or mixed physically with 40% NaOH and sold as sodium orthosilicate) were also commonly used as the active ingredient in cleaning formulations, including oven cleaners. (40–41; 50–52; 55).

33. The cleaning reaction, generally speaking, is the reaction of the base alkali (frequently referred to as a "caustic" because of its high pH and consequent corroding effect on skin, eyes, and metals) with the fatty acids and other compositions which comprise the baked-on residue. (DX 72, Tab. 1, Col. 2, lines 9–15) This reaction produces an alkali metal salt commonly known as soap. (1731, 1746–1747) This soap-making reaction is described by the term, "saponification." (DX 72, Tab. 1, Col. 2, lines 9–15). The soap does not stick to the oven surface and can be wiped off, leaving a clean surface. (DX 77, Col. 3, lines 34–36).

34. In addition to the alkali cleaning ingredient, it has also been common in the prior art to add certain other ingredients to oven cleaners, such as humectants, surfactants ammonia, and others, to enhance, in one way or another, the alkali cleaning action. (DX 2; 358–60; DX 3; DX 556; PX 32; DX 72).

35. Perlman patents 3,031,408 and 3,031,409, which issued April 24, 1962 are prior art references which teach the aerosol packaging of a reduced caustic oven cleaner (preferably 2–3% sodium or potassium hydroxide). (DX 72, Tabs. 6 & 7). This cleaner also contained compatible surfactants and glycols which functioned as humectants. (1226–31; DX 77, Col. 2, lines 32–41) The '409 Perlman patent also taught that the spraying of the cleaner as a foam can be accomplished by, but is not inherent in, aerosol packaging. Of the 32 examples disclosed in the patent, 16 produced a non-foaming spray. (DX 85, pp. 14–16) But, Perlman says, the same "exceptionally good cleansing action" may be obtained from the spray as from the foam. (DX 85, p. 12) A similar result is suggested by the patent in suit wherein it is said the same results were obtained from a "conventional pressure

denied under oath that he had made a written disclosure of his invention to his patent attorney. (1320–1322) Subsequently, under Order of Court, Plaintiff produced Mr. Perry's invention disclosure to his attorney, which reads:

"For the oven cleaner, the ratio of tetrahydrofurfuryl alcohol and furfuryl alcohol is essential. It can be varied somewhat but neither can be eliminated or replaced with like alcohols." (DX 63, 525).

Mr. Perry's admissions in the Canadian and Great Britain applications as to the significance of claim 11 are also highly revealing and consistent with his disclosure to his patent attorney. In Devex

Corporation v. Houdaille Industries, Inc., 382 F.2d 17 (7th Cir. 1967), the Court stated:

"The fact that he made an admission to the Canadian Patent Office as to the date of his patent disclosure contrary to that which he previously made to this Court, in which he now persists, relates to his credibility and presents a matter for consideration by the trier of the facts." (At p. 25)

Finding 30 is consistent with the Seventh Circuit's recent decision in General Foods Corporation v. Perk Foods Co., 419 F.2d 944 (7th Cir. 1969). The matter is further discussed under the heading "Fraud."

atomizer" as from a foam-producing aerosol package containing a composition having a surfactant. (DX 77, Col. 3, lines 38–40).

36. The Perlman oven cleaning compositions were not water-based, but were to be applied to an oven surface which had been wetted with water prior to the application of the cleaner. (DX 72, Tab. 6, Col. 4, lines 18–21, Tab. 7, Col. 3, lines 54, 71–73) The patents *per se* do not disclose the use of the compositions on a hot oven, but Dow's expert, Dr. Colburn, testified that they are chemically suitable for application to a hot oven, and the file history of the '409 Perlman patent, page 30, states that the "glycol or glycol ether is utilized to raise the flash point of the mixture and insure safe use of the cleansing composition upon heated oven surfaces" (99, DX 85; DX 86).[2] It is thus apparent that the Perlman cleaners were suitable for use on a hot oven and were intended to be so used if the housewife desired. In fact, the file history of the patent in suit disclosed (DX 75, pp. 34–45) that Mr. Perry applied two of the Perlman compositions and the commercial embodiment of the Perlman patents (an oven cleaner known as "Hep") on a heated oven surface without difficulty and obtained better results on a hot surface than a cold surface.

37. Boucher patent 3,079,284 (not considered by the Patent Office), which issued February 26, 1963, is a prior art reference which discloses an oven cleaning composition with more than 50% water and containing sodium hydroxide in an amount as low as 5%, sprayed on an oven which is then heated to increase the "efficiency of the chemical reaction of the cleaning agent with the soil to be removed, e. g., the saponification of charred fats, or the like." The use of heat is said to permit a lower concentration of sodium hydroxide thereby making the cleaner less irritating to the skin.

Boucher states that the cleaning reaction produces "a soapy residue on the surface in which the remaining soil is suspended and which may be easily wiped off to leave the desired clean surface." Boucher also discloses the use of ammonia as commonly used oven cleaner additive. (DX 72, Tab. 1).

38. Cleveland patent 1,370,188 (not considered by the Patent Office) which issued March 1, 1921 is a prior art reference which discloses a 5% sodium hydroxide aqueous solution which is to be sprayed hot onto a surface to remove paint. The function of the sodium hydroxide is "to enter into combination with the oil of the paint and convert it into soap which dissolves and is washed away, thus causing the pigment to become loose and in turn be washed away by the water." Thus, the cleaning reaction known as saponification is common to both oven cleaning and stripping of oil-based paints. (DX 72, Tab. 3).

39. Phillips British patent 825,960 which issued December 23, 1959 discloses an oven cleaner containing an aqueous solution of sodium hydroxide in an amount as low as 5%. This oven cleaner contained a wax-like substance that enabled the packaging of the cleaner in solid stick form. The patent also teaches the use of surfactants and the inclusion of up to 15% propylene glycol (one of the humectants of the patent in suit). (DX 72, Tab. 4).

40. Arden patent 2,992,995 which issued July 18, 1961, is a prior art reference which discloses an aqueous solution of sodium hydroxide in an amount as low as 4% for cleaning purposes. This cleaner is to be used at temperatures over 200°F. in the form of a dip (that is, the cleaner is heated rather than the object to be cleaned). This reference also discloses the use of glycerol and glycol as evaporation retarding humectants. (DX 72, Tab. 5).

---

2. Mr. Perry's attorney was aware of the "heated oven surface" language in the Perlman file wrapper (DX 86) although there is no evidence that Perry, or his attorney, called this fact to the attention of the Patent Office when they were attempting to distinguish over Perlman.

41. Although not a patent, a publication entitled Henley's Formulas, Processes, and Trade Secrets, (1948) (DX 611, Tab. 14), a reference book for the home, carries the following instructions:

"TO CLEAN A GAS STOVE—An easy method of removing grease spots consists in immersing the separable parts for several hours in a warm lye, [sodium hydroxide] heated in about 70°C. (158°F.), said lye to be made of nine parts of caustic soda and 180 parts of water. [5% sodium hydroxide and 95% water] These pieces, together with the fixed parts of the stove, may be well brushed with this lye and afterwards rinsed in clean, warm water. The grease will be dissolved, and the stove restored almost to its original state." (Material in brackets added)

42. The prior art patents and the Henley publication described above illustrate that it was common practice to use alkalis such as sodium hydroxide as the cleaning agents for oven cleaning compositions; that aqueous solutions of sodium hydroxide in the range of 4 to 5% were common in oven cleaners; that the use of heat, either applied to the cleaning composition or the object to be cleaned was known to be desirable in speeding the saponification and other chemical cleaning reactions; that surfactants are commonly added to oven cleaning compositions; that humectants are commonly added to oven cleaning compositions; that glycerols and glycols, including propylene glycol are common, interchangeably-used humectants in oven cleaners; and that oven cleaners packaged in aerosol cans were used in either foam or spray applications.

### OVEN CLEANER PRIOR ART NOT APPEARING IN PATENT OFFICE RECORDS

*A. John J. Sullivan's Activities*

43. In the early 1950's, a young chemist, John J. Sullivan of Boston did chemical consulting work for a Connecticut concern, the Wolcott Company. (1542) The President of Wolcott, a Mr. Frank Wolcott, had been the original United States developer and merchandiser of the paste-type oven cleaner "Easy Off" which was later acquired by Defendant Boyle-Midway. After selling his paste oven cleaner formulation and business to Boyle-Midway, Mr. Wolcott developed an aerosol valve stem brush type applicator which would allow the safe, controlled application of a detergent foam to an oven surface. (1542, 1552) (See DX 533)

44. Mr. Sullivan's original formulation work with water-based caustic oven cleaners parallels in time his working association, first with Mr. Wolcott's brush applicator, and subsequently with a sponge-type applicator (DX 535) promoted by Mr. Frank Hoar of Essex Laboratories and a Mr. Frank Sugrue, President of Shield Chemical Company until 1958.[3] (1566)

45. The first caustic cleaner which Sullivan experimentally packaged in an aerosol container (in 1954) was a white-wall tire cleaner containing 15 to 16 per cent by weight glycol, $3\frac{1}{2}$ per cent potassium hydroxide, 4 or 5 per cent silicate, $\frac{1}{2}$ per cent surfactant, and the remainder water. (1548, 1585, DX 543) This heavy-duty detergent product was not put on the market in aerosol form because aerosol can and valve technology was not at that time sufficiently advanced to make the product attractive from either a technical or price standpoint. (1549)

46. By late 1956 and early 1957, Sullivan's efforts were again directed toward aerosol packaging of a heavy duty detergent system. (1551, 1552) After several trial and error approaches to such a product, Sullivan developed an aerosol-loaded oven cleaner designated as OC No. 1. The components of this oven cleaner included $9\frac{1}{2}$ per cent free potassium hydroxide, 2.7 per cent by weight

---

3. This is the same Shield Chemical Company that first aerosol packaged Perry's patented composition. (1530–32)

of Tween 80 and 2.7 per cent by weight of Span 80. Tween and Span are trademarked ingredients which together functioned in the oven cleaner as a humectant-surfactant system. The remainder of the material in the aerosol package was water and the propellants Freon 114 and Freon 12. (1553–1555, DX 556)

47. In January 1957, Sullivan placed OC No. 1 (at that time designated W–6) in an aerosol can and allowed it to stand at room temperature for a period of eight months. This test showed the product to be in excellent condition with sufficient pressure still in the can to allow a foam to dispense from the container. (1608, 1609, DX 555)

48. The amount of KOH flake (caustic potash) by weight in OC No. 1 is listed in Sullivan's lab books as 11.3 per cent. The evidence shows that commercial grade caustic potash is from 90 to 92 per cent pure potassium hydroxide. (1618)

49. Thus, Sullivan added approximately 10.1 per cent by weight of pure potassium hydroxide to his OC–1 oven cleaner. The evidence also shows that when the potassium hydroxide is brought into mixture with the water and the Span 80 and Tween 80, a saponification reaction occurs between the Span 80 and and Tween 80 and the potassium hydroxide. After the reaction, which takes only 15 or 20 minutes, there is theoretically an amount of free potassium hydroxide in the OC–1 solution of approximately 9.6 per cent. (1618, 1619)

50. This theoretical figure of a percentage of potassium hydroxide less than 10 per cent was supported by independent experiment of Dr. Robert M. Lazo, whose expertise in the chemical field was thoroughly established. (3345, 3346) Dr. Lazo prepared a 600 gram sample of OC No. 1 which contained 11.3 per cent commercial grade caustic potash, 2.7 per cent Span 80 and 2.7 per cent Tween 80, with the remainder of the solution being water. By actual measurement, the OC–1 formula was determined to contain free potassium hydroxide in the amount of 9.83 per cent by weight. (3348)

51. Dr. Lazo described the Span 80–Tween 80 surfactant-humectant system as containing polyhydric alcohols, which means alcohols containing three or more hydroxyl groups. (3353, 3369) Span 80 is a nonwater soluble Sorbitan Mono-oleate. Tween 80 is a water soluble Sorbitan Polyoxyethylene Mono-oleate. (3362, 3368)

52. By January 9, 1959, Sullivan had shelf-life tested his OC No. 1 formula in drawn aerosol cans for two years. He found no leakers whatsoever in the drawn or two-piece can (with no side seam). (1656–1658, DX 568)

53. Sullivan's OC–1 oven cleaner was on sale from 1957 up to and including the time Mr. Perry made his alleged invention. Sullivan loaded the OC–1 formulation in sample aerosol cans for Essex for subsequent submission to potential customers, including Bon Ami and others. During this period of time the product was submitted to customers with Risdon brand break-up buttons for spray foam application as well as with the alternate sponge applicator. (1660–1661, DX 569) The OC–1 formula was suitable for application to a heated oven surface and, in fact, was so used by Dr. Terry at Bon Ami (1816–1817).

54. Essex Research, with whom Sullivan had dealt, dissolved after having financial difficulties in late 1959. After that date, Sullivan dealt directly with customers, including Bon Ami and others in his effort to sell his aerosol loaded OC No. 1 oven cleaner. (1661, 1662) In Sullivan's words, his attempts to sell his oven cleaner were thwarted by cautious marketing men in the field who wanted a hand lotion that would do an oven cleaning job. (1577)

55. Sullivan personally offered his OC No. 1 product to the Fuller Brush Company in 1960, 1961 and 1962. (1575) Sullivan quoted prices to various prospective customers and employed salesmen and manufacturers representatives from 1960 through 1962 in an effort to find a customer willing to market his oven cleaner. (1576) Sullivan's oral testimony was well corroborated by con-

temporaneous documents kept by him in the regular course of business.

56. Sullivan's records show a price quotation to Armstrong Laboratories prior to Perry's invention date, for up to a half a million pound shipment of the OC–1 formula for aerosol loading by Armstrong. (1686, 1687, DX 576)

57. Contemporaneous with his work on the development of OC No. 1, Sullivan also formulated a whitewall tire cleaner suitable for either aerosol spray foam or mechanical pump application. The product contained one per cent by weight caustic soda, two per cent D–66, a surfactant, and five per cent diethylene glycol, a humectant, with the remainder of the formula being water. (1650–1651, DX 566) A modification of this formula was made which contained one per cent caustic soda, one per cent D–66, ten per cent diethylene glycol and the remainder water. A test of this formula showed that the foam generation and stability of the product were excellent. Fifteen gallons of this whitewall tire cleaner were sold to a Mr. Ed Devine of Crystal C and C Co. (1652, 1653, DX 567).

58. The activities of John J. Sullivan constitute the placing of an aqueous caustic surfactant humectant aerosol oven cleaner, suitable for application to a heated oven surface, in the form of a spray foam, and an aqueous caustic surfactant humectant aerosol loaded whitewall tire cleaner, on sale prior to 1962. This was before Perry's earliest work on the invention of his patent and more than one year before the filing date of his first application on December 4, 1963. There is no evidence that Sullivan, who testified at the trial, ever suppressed, abandoned, or concealed his products or his work in this area. On the contrary, there is evidence of continuous sales activity on the OC–1 oven cleaner, by and on behalf of Sullivan, during the 1957–1963 period.

*B. The Oven Cleaner of the Beam Chemical Company*

59. From 1957 to 1961 or 1962, Mr. M. A. Becker was President and Mr. Ralph Lemorande was Vice President of the Beam Chemical Company of Oconto Falls, Wisconsin, a manufacturer of various cleaning compositions. From 1961 or 1962 to 1965, Mr. Lemorande was President and Mr. Becker was Chairman of the Board of the Beam Chemical Company. (267–68; 522–23)

60. Mr. Lemorande's work at Beam in the period 1957–65 included formulating compositions, packaging, shipping, sales, correspondence, and total involvement in the operations of the company. (264; 571–73) Mr. Becker was involved in the distribution, financing, purchasing, and development of the company. (584–85)

61. Beginning in 1957 and continuing to the present, the Beam Chemical Company has manufactured and sold an oven cleaner, first under the name "Beam Oven and Grill Cleaner", and, by 1958, under the name of Beam "Wipe Away". (322–23; DX 24) The name "Wipe Away" was not used by Beam after about March 1962. (324–28; DX 26)

62. "Beam Oven and Grill Cleaner" was sold in glass bottles in 1957–58 and was applied in the form of a spray from a "Windex" type dispenser. (298–99; DX 17; 427–29)

63. Beginning at least in 1958 and continuing throughout the period that the name was used, Beam "Wipe Away" was sold in plastic "squeeze" bottles having an air space inside the bottle and a dip tube extending through the air space into the cleaner. The cleaner was applied by squeezing the bottle, causing the cleaner to be forced up the dip tube to one orifice of the nozzle and causing the air inside the bottle to be forced out another orifice of the nozzle, thereby mixing with the cleaner and causing it to be propelled from the container in the form of an atomized spray. (DX 24, 25; 327–28; 430; 533–35) The Windex-type dispenser and the plastic squeeze bottle are each examples of a conventional pressure atomizer. (317–18; 1479–81; 1792–93)

64. The glass bottle oven cleaner sold by Beam had a glue-on label which contained the following directions for use:

"1. Hold bottle upright and squeeze to spray liquid on soiled surfaces. Works faster on warm surfaces. (Non-inflammable)"

"2. Wipe clean with damp cloth when soil is soft, time may be 5 to 20 minutes depending on amount of soil."

"3. Can be used for soaking purposes by adding 3 oz. to each gallon of hot water." (DX 19)

65. The plastic squeeze bottles in which Beam "Wipe Away" was sold in 1958–59 carried the same directions for use as set out in Finding 64. (DX 24)

66. Prior to 1962, the Beam Chemical Company also sold its oven cleaner in gallon containers. The label for such containers in the period 1959–61 contained the following directions:

"Apply on warm or hot surfaces—wipe clean with damp cloth".

For containers such as deep-fat fryers, the directions stated that "Wipe Away" could be used as a dip, in which case it was to be diluted, put in the container to be cleaned, and "heat to approximately 200°F." (DX 22; 313–15)

67. The label for the gallon containers also stated, however, that for use on ovens the cleaner should be applied as a spray by using a "polyethelene bottle or pressure sprayer"; that is, the purchaser could either use the squeeze bottle (DX 24) which was packed by Beam in each case of four gallons or purchase a squeeze bottle or some other type of pressure sprayer to apply the oven cleaner. (DX 22; 435–36; 722–23)

68. Representative sales of Beam oven cleaner in one area (Boston) in the period 1959–60 are shown by invoices, packing slips, and bills of lading forming Defendants' Exhibits 31 A–C and 32. (344–54)

69. Advertisements for sale of Beam "Wipe Away" appeared in the November 6, 1958 edition of the Green Bay Press-Gazette and the February 23, 1958 edition of the Milwaukee Journal. (DX 21, 21A; 309–12)

70. In 1958 Beam "Wipe Away" was demonstrated on live television by Mr. Lemorande, personally. During these demonstrations Mr. Lemorande would spray the oven cleaner on warm surfaces to demonstrate its cleaning ability and method of application. (408–09)

71. A printed publication in the form of a circular dated May, 1961, distributed by Cirelli Foods of Brockton, Massachusetts, one of the stores in which Beam "Wipe Away" was sold, contains the following statement concerning Beam "Wipe Away" (DX 29; 335–36):

"BEAM WIPE AWAY cuts burnt-on grease and cooking deposits of all kinds! It is very easy to use, just spray it on—and wipe it off with a damp cloth; it will leave no residual. Wipe Away may be used on warm surfaces (in ovens and on grills it is better to allow units to cool to approximately 200°), and will clean surfaces instantly without having to wait for them to cool down completely."

Mr. Lemorande testified that this digest accurately set forth the directions for use of Beam Wipe Away. (337–38)

72. Mr. Lemorande was familiar with the composition of the oven cleaner sold by Beam in the period 1957–65 and personally did the mixing of the ingredients. (351–52) On April 8, 1960, Mr. Lemorande made a typewritten copy of the formula then being used for Beam oven cleaner. (DX 2; 354–55) The formula is as follows:

Per Gallon of Concentrate

| | |
|---|---|
| 4 oz. Sodium Hydroxide | (Wgt) |
| ½ oz. Sodium Metasilicate | " |
| 4 oz. Trisodium Phosphate | " |
| 3 oz Glycerine | (Volume) |
| 2 oz. Triethanolamine | " |
| ½ oz. Perma Kleer | " |
| 3.5 oz. Triton 102 (BM2) | " |
| 1.5 oz. Dowfax | " |
| 2 oz. CMC Hercules | (Wgt) |
| 1 oz. Tamol N. | " |
| 1.5 oz. QS Triton 15 [4] | " |

4. Triton OS 15 was a handwritten addition to the formula made sometime after April 8, 1960. (360)

The "Per Gallon of Concentrate" statement in the formula means that water is added to the formula shown to make one gallon of oven cleaner. (357) Glycerine is a humectant and Triton 102 and Dowfax are surfactants. (350–60; 78–79) The amount of glycerine exceeds the 1% referred to by Perry as being satisfactory. (76–77; DX 77, Col. 3, lines 53–56)

73. Expressed in terms of weight percent of the Beam oven cleaning composition, in the period 1957–65, the water content was in excess of 50%, and the sodium hydroxide content did not vary outside the range of between 3.5 to 5 ounces per gallon. (362; PX 2; 143–44) The 4 ounces of sodium hydroxide in the formula set out in Finding 72, expressed in weight percent of the composition, is about 2.8%. (72–73)

74. In the period 1957–65, the Beam oven cleaner at all times contained a humectant and a surfactant. (DX 2) The humectant was usually glycerine but on occasion during 1957–62 it was propylene glycol. (361) The surfactants were of the nonionic (e. g. Triton 102) and anionic (Dowfax) type. (359–60; 78–79)

75. Prior to 1962, the Beam Chemical Company oven cleaner was a freely flowing liquid which contained sodium hydroxide and water in the amounts called for by each claim of the patent in suit in issue.

76. Prior to 1962, the Beam oven cleaner contained a humectant and surfactant of the types called for in those claims of the patent in suit which specify either a surfactant or a humectant.

77. Prior to 1962, the directions for applying the Beam oven cleaner were to apply it by spraying on a hot surface as called for by each method claim of the patent in suit.

78. Prior to 1962, the Beam oven cleaner was dispensed as a spray propelled by air from a conventional pressure atomizer in the form of a plastic squeeze bottle or a plunger-actuated "Windex" type bottle. (298–300; 435–

36) The patent in suit calls for the spraying of the oven cleaner from an aerosol container by a propellant, and states that the cleaning results are the same whether the cleaner is sprayed on a hot oven from a conventional pressure atomizer (which uses air as the propellant) or from a conventional metal can packaged in known manner and containing a conventional volatile liquid propellant such as butane.

79. The Beam oven cleaner described in Findings 75–78 was publicly used and demonstrated, sold, and offered for sale on a large scale more than one year prior to December 4, 1963, the date of first application leading to the issuance of the patent in suit.

80. Aerosol spray-type metal cans and propellants were well known in the prior art as appears from the patent. (DX 77, Col. 3, lines 29–31) No particular (much less surprising or unobvious) advantage has been shown to result from the combination of the oven cleaner and a conventional aerosol spray-type metal can, nor is any problem in making this combination shown to have existed or to have been solved by the disclosure of the patent. There is no limitation in the claims which would indicate a problem. If a problem relating to the aerosol packaging of an aqueous caustic composition is alleged to have existed in the art and to have been solved by the patentee, it must be disclosed and the best method of solving it then known to the patentee must also be disclosed pursuant to 35 U.S.C. § 112. No such disclosure appears in the patent in suit. Instead, the patent clearly and unequivocally states that the cleaner (in addition to being packaged and sprayed from a conventional pressure atomizer) was "packaged in a *known manner*" in a metal can, using a "*conventional* propellant." (emphasis added)

81. The testimony shows that the idea of packaging the Perry oven cleaner in an aerosol can was not Perry's but was suggested by Vaughn Electric Company, a firm that had been previously supplied with the Perry oven cleaner in Beam-

type squeeze bottles by Mr. Hannon, Mr. Perry's salesman. (1088–89; 1158; DX 56) There is no evidence that either Mr. Perry or the aersol packer, Shield Chemical Company anticipated or solved any problem, nor that they were surprised at the result of the aerosol packaging, nor that the combination performed other than would be the natural and expected result of the combination of conventional elements.

82. Plastic squeeze bottles and "Windex" pressure sprayers as used by Beam, were also well known in the prior art. Perry packaged his oven cleaner in Beam-type squeeze bottles as well as metal cans prior to his application for patent (1946–47; DX 54), and it appears from the patent (Col. 3, lines 29–40) that he obtained the same results from either type of spray dispenser. Perry was unable to name any structure other than the Beam-type sprayer which could have been the basis for his flat representation in the patent that the same results were obtained with a conventional pressure atomizer as with an aerosol dispenser. (2543–2547)

83. The selection of means by which to apply the oven cleaner in the form of a spray is a matter of choice, as is shown by the patent specification (see Finding 22) and the claims are broad enough to cover both metal cans and squeeze bottles. The combination of the oven cleaner and either a conventional metal can or squeeze bottle does not constitute invention, nor was the combination an invention of Perry, (even if it were inventive).

## C. The Work of Seljan

84. John W. Seljan was a man whose background included actual experience cleaning grills and ovens. His first experience with chemical formulating came when he was employed by the Cee-Bee Chemical Company in California in the 1940's. (836, 838) Among other products, the Cee-Bee Chemical Company made industrial cleaners for metal plating industries and the air craft industry. (840)

85. One such formulation included 5 per cent potassium hydroxide by weight, $\frac{1}{10}$ of 1 per cent sodium chromate employed as a rust inhibitor, and $\frac{1}{2}$ of 1 per cent Triton X-100 employed as a wetting agent (surfactant). The remainder of the solution was water. (841–843). This formula was used with a steam cleaning spray apparatus with the formula being sprayed from one nozzle and the steam which was used to heat and rinse the metal, sprayed from an adjacent nozzle alternately with the formula. (843, DX 516). The system was used to clean an oily preservative from the metal. (849)

86. Seljan left Cee-Bee Chemical in 1952 and started his own chemical business called Coast-to-Coast Chemical Co., located in Gardena, California. From California, Seljan moved his business to Dallas in 1955 and to Green Bay, Wisconsin in 1957. (854) While in Green Bay, Seljan became aware of the Beam Chemical Co. and its oven cleaner product. (855, 56) Seljan immediately formulated an oven and grill cleaner to compete with Beam which he sold in gallon jugs accompanied by a Windex-type spray bottle which could be filled from the gallon jug. (857, 58; DX 517, 517–A) The formula used for this oven and grill cleaner was a mixture of 1 lb. sodium hydroxide in a gallon of water with approximately $\frac{1}{2}$ per cent Triton X-100, a surfactant, and 2 per cent ethylene glycol, a water evaporation retardant. (858, 859)

87. When Seljan formulated his oven cleaner in Green Bay, he was aware of the fact that Beam Wipe-Away was sold for application to warm ovens and grills. (863) He selected a water evaporation retardant (ethylene glycol) for his formula to prevent its evaporation from the oven surface. (861) His knowledge of the humectant properties of ethylene glycol stemmed from his knowledge that it was commonly used in automobile radiators to prevent evaporation of the hot water. (861) Seljan sold his oven cleaner from July of 1957 through the first

part of 1958. In all, he sold about 400 gallons of the formulation. (861, 862)

88. In November of 1958, Seljan returned to California where he manufactured a product called Dip-Away for oven cleaning. Seljan mixed his Dip-Away formula in a small metal drum in his backyard. This formula contained from 15 to 18 per cent potassium hydroxide,[5] a dye to give color to the formulation, and ethylene glycol to prevent evaporation of the solution from the surface to be cleaned. (864–866) The ethylene glycol used was between 1 and 3 per cent by weight of the solution. (875) He supplied customers with directions for use of his oven cleaner which included instructions to spray the aqueous caustic solution onto a heated oven surface. He did this in response to his customers' employees' experience that spraying was a convenient method of application. (876)

89. During 1959, Seljan personally went to kitchens and restaurants to demonstrate the use of and sell his product. (875, 876) From August 17 through August 20, 1962, Seljan demonstrated his product at the National Restaurant Association Convention in San Francisco attended by some 35,000 people. (880, 898; DX 501) During the demonstration, Seljan used an electric heating element to heat the encrusted stainless steel pans which were to be cleaned. The pans were heated to approximately 200°, the Dip-Away was sprayed on the pans and the grease and dirt were observed to dissolve in three to five seconds. (885, DX 501–A) During the demonstration in San Francisco in August of 1962, approximately 2,000 advertising brochures setting forth the spray-heated surface method of application were distributed to various people there. (898, DX 502)

90. Seljan marketed his product Dip-Away (later changed to Dip-R-Spray) in gallon containers. (DX 506, 876, 877) The gallon containers were packaged four one-gallon containers to a case and each case included a plastic spray bottle. (877) Prior to the August show in 1962, Seljan had sold between 1500 and 2000 such cases of Dip-Away. In each of these cases a label instructed the consumer to use the product on a warm or hot oven. (910) The small container into which the contents could be poured (DX 517) included a Windex finger action spray member. (911) Seljan was still successfully marketing his product at the time of his deposition on January 8, 1969. (923)

91. After Seljan had been exposed to the needs of the industry for an aqueous caustic oven cleaning product and after he had been exposed to Beam's answer to these needs in Wisconsin, he was, within a short time, able to manufacture a product with similar components which worked in a similar fashion. The fact that Mr. Seljan had no formal education in chemistry but was immediately able to develop and market a successful aqueous caustic, surfactant, humectant, oven cleaner for spray application to a heated oven surface is strong evidence of lack of invention in the Perry product.

**D. The Bissell Oven Cleaner**

92. In November, 1962, Capitol Packaging Co. of Melrose Park, Illinois made and sold to Bissell, Inc. of Grand Rapids, Michigan, an aqueous caustic oven cleaner which was packaged in a conventional aerosol spray-type metal can with a conventional propellant (DX 3, 5, 6, 7, 8).

93. The formula for the oven cleaner referred to in Finding 92 was developed at and by Capitol Packaging Co., (170–72) and in the time period from the first sale in November, 1962 until 1966 the formula, expressed in weight percentage

5. The patent sets an upper limit of 10 per cent for the alkali metal hydroxide. The stated purpose is to avoid stringent labeling requirements. Mr. Seljan testified that he "jacked it up to make it stronger" (928), and improved both the speed and performance of his product. (928) Mr. Seljan seemed to adapt quite readily to the labeling requirements raising serious questions as to the validity of the 10 per cent, or any other per cent, limitation as an inventive feature.

of the composition, was as follows (DX 3; 83–85):

| | |
|---|---|
| Sodium orthosilicate | 7% |
| Sole-terge 325 | 7% |
| TS–2S | 2% |
| Safrol | 0.075% |
| Water | 83.925% |

94. Sodium orthosilicate is a physical mixture (as opposed to a chemical union) of sodium hydroxide (NaOH) and sodium metasilicate ($Na_2SiO_3$) in the respective weight proportions of 40–60. (55–57; 129–130) This fact is supported by testimony, calculations and tests performed by Dow's chemical expert, Dr. Colburn, and by a recognized chemical text, The Condensed Chemical Dictionary (Sixth Edition). (130–31; DX 93) Based on both his formula calculations and his analysis of an aqueous solution of the product, Colburn testified that a 7% aqueous solution of sodium orthosilicate contains 2.8% free sodium hydroxide. (58–59)

95. Dr. Colburn further testified that both TS 2S and Solterge 325 are surfactants, the latter also containing about one-quarter free diethanolamine which is a humectant containing two hydroxyl groups and therefore a glycol. (84; DX 91; 2497–98; 3356–57) Safrol is a perfume. (84)

96. The formulation of the oven cleaner sold to Bissell by Capitol Packaging Co., in November, 1962, thus contained over 50% water, 2.8% free sodium hydroxide, a surfactant and a humectant.

97. The oven cleaner sold to Bissell by Capitol Packaging Co., in November 1962 was packaged in a conventional aerosol spray-type metal can containing, as propellants, 6% Freon 12 and 6% methylene chloride. (DX 3) Freon 12 and methylene chloride are and were, in 1962, conventional propellants. Mr. Perry told the Patent Office that "the invention does not lie in any particular kind of propellant as long as it propels; * * *" (DX 75, p. 31)

98. Contrary to Shelco's contention that Perry was the first to overcome the alleged fear in the art that an aqueous sodium hydroxide solution could not be stored in a metal aerosol can without leakage, it appears from the testimony of Mr. Burkholder, Bissell's director of quality control from 1962 to the present, and Mr. Weiner, President of Capitol Packaging from 1955 to 1966, that no problem of can leakage was experienced by either Bissell or Capitol Packaging. (246; 3288–89) This testimony is supported by the fact that a product manufactured according to the formula set out in Finding 93 was marketed by Bissell in a conventional metal aerosol can continuously from its introduction in November, 1962 until sometime in 1966, when the formula was modified. (3287–88; 3297) It is also supported by Mr. Weiner's testimony that prior to November 1962, the formulation set out in Finding 93 was packaged in a conventional metal aerosol can and tested for shelf-life for a period of from nine months to one year without evidence of leakage problems. (227) In addition, Mr. Burkholder identified DX 106 as a can of Bissell oven cleaner made in 1963. (3290–91) This can showed no signs of leakage.

99. Bissell did experience some occasional minor instances of can leakage, but similar can leakage was experienced by Shelco as well. (246; 1110–11) There is no testimony that such leakage was due to anything other than inadequacy in the can's side-seam soldering or other can construction defects. (1110–11; 3179–80)

100. As demonstrated in Court by Dow, the Bissell oven cleaner of DX 106, which was made in 1963, but contained the same formula and propellants as used in November, 1962, was sprayed from the can and was deposited on a metal surface in the form of a stable foam. (3292) The Court has evaluated the later spraying from the same container by Shelco, again in the form of a stable foam, and Perry's characterization of the spraying as, "a classic example of a plugged valve," and finds such an attempted crit-

icism of a seven-year old product to be inconsequential. (3392)

101. Dow also conducted a demonstration in Court of the foam characteristics of Shelco's oven cleaner. This cleaner also sprayed from the can and was deposited on the metal surface in the form of a foam, but after a short period of time the foam had slid down the test panel onto the floor. (2174–75)

102. The Bissell directions for use contained on DX 106 do call for the oven to be cool and the pilot light to be off. Nevertheless, Dr. Colburn testified that the Bissell aerosol-packaged oven cleaner, as sold by Capitol Packaging Co. in November, 1962, contained nothing, from a chemical standpoint, which would interfere with its use on an oven heated to "say, 180 degrees Fahrenheit". (89; 123) Dr. Colburn freely admitted that the *chemicals* methylene chloride and Freon decompose to some degree when exposed to a flame, and that one of the many decomposition products "may or may not be a poisonous gas called phosgene". (123–24) He testified that if this gas were produced, it is in very small amounts. (124) There is no testimony that the Bissell *oven cleaner* would produce any poisonous gas if exposed to a flame. To the contrary, Dr. Colburn testified that he personally had tested oven cleaners containing propellants such as methylene chloride on hot ovens (for purposes not related to this litigation or any of the defendants in this case). (126) It should also be noted that the propellant used in Shelco's cleaner (butane) is highly flammable by itself, (2542) but apparently this does not prevent its use as the propellant in the oven cleaner composition.

103. The court finds that the Bissell cleaner sold by Capitol Packaging Co. in November, 1962 was suitable for use on a hot oven. In addition to the supporting testimony of Dr. Colburn, this finding is also corroborated by Mr. Burkholder's testimony that he knew of no problem or complaints arising from the use of methylene chloride or Freon 12 as the propellants in the Bissell cleaner (3289),

and the fact that Perry himself could not name one specific complaint arising from his extensive use of concentrated methylene chloride solution (up to 70%) in paint cleaners and degreasers. (2494–97)

104. While Shelco now expresses great concern over the possible production of small amounts of phosgene, the patent does not warn against the use of either of these propellants, and the claims were intentionally drafted broad enough to cover their use. (See Finding 97)

105. Shelco's position, as stated in answer to Dow's interrogatories is that the *composition* claims of the patent in suit are infringed by the manufacture or sale of an oven cleaner product which comes within the language of its composition claims, regardless of whether the product is actually used on a hot or cold surface. (804–05) Thus, the expression "for application to a hot oven", contained in all of the *composition* claims, interpreted most favorably for Shelco, can mean no more than that the composition must not contain any material which would make the cleaner obviously objectionable for application to a hot oven.

106. The Bissell oven cleaner made and sold by Capitol Packaging Co., in November, 1962 was an aerosol metal can-packaged oven cleaner containing over 50% water, 2.8% sodium hydroxide, a surfactant, and a humectant, as called for by the *composition* claims of the patent in suit. It was suitable for application to a hot oven.

107. The manufacture and sale of the Bissell oven cleaner by Capitol Packaging Co., more than one year before Shelco's first filing date constitutes a prior public use and sale of the invention covered by the composition claims of the patent in suit.

*E. The Winbro 403 Oven Cleaner*

108. In October, 1962, the patentee made and sold a batch of oven cleaner under the designation "Winbro 403". (DX 54, 55, 82, 83A, 83B; 821–22) This cleaner was made from the formula

set out as the Example in the patent, without the furfuryl alcohols. It contained over 50% water, 3% sodium hydroxide, a humectant, and a surfactant as called for by all of the claims. This oven cleaner was sold in bulk form in a 30 gallon drum. (821; DX 83A, 83B)

109. In October, 1962, the patentee also made a 20 gallon batch of the oven cleaner described in Finding 108. (820) This 20 gallon batch was packaged in plastic squeeze bottles of the type used to package the Beam oven cleaner. (821) It was used for test purposes, and, in addition, a bottle of this oven cleaner was given to Dorothy Hall, a home economist for Vaughn Electric Co., of Somerville, Massachusetts, prior to December, 1962. (822; 615–16) This bottle was given to Mrs. Hall without any restriction as to confidentiality. (620–21)

110. The October 1962 bulk sale of 30 gallons of Winbro 403 (the cleaner which is the example of the patent in suit without the furfuryl alcohols), more than one year before the filing date of Perry's first application, constitutes a "public use or on sale" of the composition invention covered by the non-catalyst claims of the patent in suit, within the meaning of 35 U.S.C. § 102(b). The package in which the cleaner was sold is immaterial. The combination of a known package and the cleaner is a matter of choice which is not only obvious under 35 U.S.C. § 103, but which may be disregarded as an inconsequential difference under 35 U.S.C. § 102(b). This is particularly true where as here, the idea for the aerosol-packaging of the Perry cleaner originated not with Perry but with Vaughn Electric Company. (Finding 81)

111. The 20 gallon batch of Winbro 403 packaged in Beam-type plastic squeeze bottles, constitutes a "public use or on sale" of the composition covered by the non-catalyst claims of the patent in suit, for the same reasons set out in Finding 110.

*F. The Work of Boyle-Midway*

112. Dr. Myron Lover, the holder of a Ph.D. in Chemistry, (954) was em-

ployed by Boyle-Midway in its research and development department beginning in 1951. (956) This was prior to the time when Boyle-Midway acquired the Easy-Off brand paste oven cleaner from Frank Wolcott.

113. Boyle-Midway's first serious efforts toward developing an aerosol oven cleaner were largely prompted when the successful marketing of an aerosol caustic spray foam product under the trademark HEP began to eat into the sales of Boyle-Midway's Easy Off paste oven cleaner. (DX 581) This product was the commercial embodiment of the Perlman patents. (2018) Dr. Lover was assigned the project to develop and did develop a non-caustic aerosol formula for consumer panel testing against HEP. In May of 1962, Dr. Lover's formula 222–97 was tested against the HEP aerosol bomb. (1986, 1987, DX 583). The results of the test showed that the Boyle-Midway product lost out to HEP by a score of almost 2 to 1 on all performance characteristics. (DX 582, p. 2, 1962). Boyle-Midway management, who until that time had been reluctant to market a spray caustic, then concluded, on the basis of HEP's market success, that a spray caustic was a necessary answer to the challenge of HEP-type oven cleaners.

114. Dr. Lover, who was responsible for oven cleaner formulation at Boyle-Midway, received a directive from his management in the early summer of 1962 to develop a caustic spray-type oven cleaner to compete with HEP. (1963, 1964).

115. Within weeks of the instruction, Dr. Lover, assisted by William Ball, a technician working under his direct supervision, developed a series of formulas containing sodium hydroxide, water, and a propellant. In addition, some contained a humectant (glycerin), and some contained surfactants. (1992, DX 584). This work, recorded on July 23, 1962, represented Dr. Lover's first effort to obtain an aqueous caustic spray oven cleaner. (1992, 1994, DX 584).

116. Shortly thereafter, a formula (262–5C) developed by Dr. Lover con-

taining sodium hydroxide, a surfactant (Deriphat 151), a fatty acid (Dresinate TX), another surfactant (QS–30), glycol ether (2LM) and water was tested by Mike Liccione, an employee of Boyle-Midway, at his home. Liccione reported that the product was satisfactory for cleaning his oven. (DX 585, 1998).

117. On October 1, 1962, some crystallization in formula 262–5C was observed. (DX 589). On October 2, 1962, this problem was solved by lowering the over-all concentration of the solids and adding more water proportionally. DX 90; 2007).

118. As a result of this solution, a formula was adopted which showed no crystallization after two months storage at room temperature. (DX 590). This formula, after being re-labeled 262–91, was assigned the manufacturing standard number 6–53. (PX 53, 2119). The formula contained 9.07 per cent by weight of a 50 per cent solution of sodium hydroxide, (roughly 4.5 per cent sodium hydroxide), 2.03 per cent of Deriphat 151 (an amphoteric surfactant manufactured by General Mills), 79.99 per cent by weight of demineralized water, 2.43 per cent Triton QS–30 (a phosphate-type organic surfactant), 1.62 per cent Dresinate TX (a fatty acid), and 4.86 per cent Ucar 2LM (a dipropylene glycol monomethyl ether) (PX 53, 2092–2098), the latter being a humectant having but one (OH) group and hence not properly identifiable as either a glycol, a glycerol or a polyhydric alcohol. (2160). The same would be true of a tripropylene glycol monomethyl ether (2160).

119. In response to a request by Dr. Lover (DX 594–8, 2021), a one thousand can plant batch of the formula was run on December 12, 1962. (DX 597, 2025). The 1000 can batch was run in tinplate, seamed containers with 298 solder, as supplied by Continental Can Company. Precision brand valves and buttons were used. (DX 599, 2038).

120. By February 26, 1963, Dr. Lover's formulation work was considered complete and the product was turned over to the In-line Product Laboratory and taken out of Dr. Lover's hands. (2042, 2043, DX 601).

121. On or about March 5, 1963, 200 cans of formula 6–53 from the plant production run were distributed to employees and friends of employees of Boyle-Midway, and of Whitehall Laboratories, in various parts of the country. (2133–2139). They were used in a blind, paired comparison test with HEP oven cleaner. There is no evidence that the panel members were under any injunction of secrecy or that their use or disposition of the oven cleaner was restricted in any way.

122. The results of the blind, paired comparison test (DX 603) showed that the Boyle-Midway formula 6–53 in the aerosol container was superior to the HEP aerosol product marketed at that time. (DX 603, p. 3). A management decision to go to full production for national marketing was made. Arrangements were made to have an outside contract filler produce the Easy Off spray oven cleaner (2052).

123. In the Fall of 1963, while arrangements for production were going forward with an outside contract filler, several cans of the original 1000 can plant batch run in December of 1962 were found to be leaking. (DX 605, 2061). As a result, production was ordered halted (PX 39, 1925) for a reexamination of the product. This reflected Boyle-Midway management's cautious attitude in marketing caustic products for use by a housewife. The evidence is conclusive that Plaintiff experienced similar leaker problems. The patent in suit neither describes such a problem nor suggested any solution. (1464)

124. Formula 6–53 was developed prior in time to Perry's work; it was publicly used in March 1963 without injunction of secrecy; and it was never abandoned, suppressed or concealed. Its use was discontinued for reasons not pertinent to the Perry patent, as indicated by a letter from C. K. Thompson, a vice-president of Boyle-Midway, to W. K. Eastham, another vice-president, dated January 16, 1964 (DX 606), in which

it was suggested that formula 6–53 be marketed in a seamless can. Only the less-preferred aesthetics of the 2-piece can (certainly not within Perry's invention) prevented this. (1972–73)

125. Dr. Lover did not participate in any further oven cleaner formulation work at Boyle-Midway. He left the field of oven cleaner work in January 1964 and had no contact with the field since that time until this trial. Subsequent work on oven cleaners at Boyle-Midway was done by individuals not previously experienced in oven cleaner formulating. Dr. Lover testified in person at the trial and his testimony was credible. It is not necessary to determine whether Dr. Lover qualifies under 35 U.S.C. § 102(g) as a prior inventor of the subject matter of the Perry patent. (No patent application was filed on Dr. Lover's 6–53 formula.) In any event, he qualifies as a "person having ordinary skill in the art" (35 U.S.C. § 103) "at the time the invention was made", and his work makes it clear that aerosol-packaged, alkali metal hydroxide, water, surfactant, humectant formulations for cleaning ovens (suitable for use on heated oven surfaces) were obvious to him at that time.

## OBVIOUSNESS

126. The use of humectants (including the interchangeability of propylene glycol and glycerine) and surfactants in cleaning compositions was well known, prior to Perry's invention, as was the use of aqueous solution oven cleaners having less than 10% sodium hydroxide.

127. It was well known in the prior art that heat would speed a chemical reaction, including the chemical reaction between oven soil and an alkali. (See, e. g., Finding 41; DX 503; 2064; DX 72, Tabs 1, 3, 5) It was likewise well known in the prior art that aqueous alkali metal hydroxide solutions, in the concentration claimed by the patent, could be sprayed on a hot oven to speed up the cleaning operation, as shown by Beam and Dip-Away. (DX 19; DX 22; DX 503)

128. It was well known in the prior art that an aqueous alkali metal hydroxide solution, in the concentration claimed by the patent in suit, could be packaged in and sprayed in the form of a foam from an aerosol spray-type metal can, as shown by Capitol Packaging and Bissell, John Sullivan, and Dr. Lover. (Findings 92–107; 43–58; 112–125)

129. In view of Findings 127 and 128, the subject matter claimed by Perry would have been obvious to one skilled in the art at the time the alleged invention of the patent in suit was made. The formulations herein set out were subject to determination by common analytical methods. (81–82; 88; 531–32; 3347–48)

130. Likewise, it would have been an obvious matter of choice at the time the alleged invention of the patent in suit was made to have added or substituted a propylene glycol or glycerine humectant to the oven cleaners of Bissell, Sullivan, or Dr. Lover, and it also would have been obvious to apply the Bissell, Sullivan or Lover oven cleaner, like Beam and Dip-Away, to a hot oven, adjusting the type of conventional propellant, if such were considered desirable.

131. When this case first came before the Court at a pretrial conference in chambers, Shelco stressed the uniqueness of the application to a hot oven. When the Beam and Dip-Away products were discovered, the importance of a foam from an aerosol dispenser was stressed. When the Sullivan, Bissell, and Lover aerosol oven cleaners were put before the Court, Plaintiff began to talk of specific concentrations of ingredients not found or distinguished in the claims and of non-claim attributes such as superiority against side seam leakage. When Sullivan and Bissell were shown to have no substantial leakage problems, then Plaintiff stressed commercial success.

132. There is no claim in the patent which calls for a foam, nor is there any statement in the patent as to the superiority of a foam as opposed to a spray. In fact, the patent repeatedly refers to a

"foam or spray" and if any distinction was intended, every one of the claims is specifically limited to a spray and not to a foam. The use of a foaming aerosol oven cleaner was not new with Perry. The Perlman patents (HEP) specifically disclose aerosol oven cleaners which foam. (DX 72, Tabs 6, 7) The Bissell, Sullivan, and Lover products foamed. (Finding 128) Nor is there language in the patent which states that propylene glycol (in any amount, much less the 20% used in Jifoam) is a unique safener. The patent merely states that "propylene glycol can be replaced by any compatible humectant", and that *any* such humectant, generally, "inherently reduces the irritating effect of the caustic on the skin." (DX 77, Col. 3, lines 41–52) At Col. 2, lines 32–43, the patent states that the use of humectants "such as a *glycerol or* glycol" reduces the irritating effect of sodium hydroxide. (Emphasis supplied)

133. Where differences, if any, between the subject matter covered by the patent in suit and the prior art exist, they are inconsequential, and are such that the subject matter as a whole would have been *obvious* at the time the invention was made to a person having ordinary skill in the art.

### COMMERCIAL SUCCESS

134. In support of the patent, Shelco has relied heavily on two separate aspects of commercial success of its oven cleaner, Jifoam, as evidence of invention. The first is Shelco's contention that Jifoam was quickly accepted in the marketplace and grew from nothing to an important factor in the market in a short period of time. (3138) The second is Shelco's related contention that because of Jifoam's success in the market, Dow and Boyle-Midway were forced to switch from the oven cleaners they had previously produced to products which come within Shelco's patent. (2685) The activities of Dow and Boyle-Midway in this respect are also said by Shelco to evidence both long-felt need and unsuccessful attempts to produce a satisfactory oven cleaner prior to Jifoam. (2644–47)

135. Commercial success is not relevant where, as here, the Court determines that there was no invention. Nevertheless, the Court, for completeness, makes the following findings with respect to Plaintiffs' alleged commercial success.

136. Before commercial success can be considered as evidence of unobviousness, the Court must determine that the alleged commercial success (here, of the product Jifoam) was attributable to the invention claimed by the patent and asserted to be used by defendants and not some other factor.

137. It is undisputed that Jifoam now does contain and always has contained, a mixture of furfuryl and tetrahydrofurfuryl alcohols. (1242–44; DX 523) Perry's original patent application set out the invention as being:

"based on the surprising discovery that a mixture of furfuryl alcohol and tetrahydrofurfuryl alcohol catalyzes and enhances the cleaning action of the sodium hydroxide, especially at elevated temperatures, to such a great extent that the amount required can be reduced to less than 1/3 and such reduced amount has a markedly greater and faster cleaning power." (DX 74, p. 3, lines 21–27)

*All* of the claims in that original application were limited to oven cleaners having a mixture of furfuryl alcohols, and the disclosure of invention to Perry's patent attorney states that, "the ratio of tetrahydrofurfuryl alcohol is essential. It can be varied somewhat *but neither can be eliminated or replaced with like alcohols.*" (DX 63, emphasis added)

138. In the patent as issued, Perry changed the furfuryl alcohols from a necessary component of his composition to a desirable one but still emphasizes their importance:

"The present invention is based in one of its aspects on the surprising discovery that a mixture of furfuryl alcohol

and tetrahydrofurfuryl alcohol catalyzers (sic) and enhances the cleaning action of the sodium hydroxide at elevated temperatures." (Col. 2, lines 27–31)

Fifteen of the claims in the patent in suit are still limited to the furfuryl alcohols, sometimes described therein as a cataylst. None of these are asserted against defendants in this case. (Claims 7, 8, 9, 10, 11, 12, 13, 15, 20, 21, 22, 23, 24, 25, and 27) Plaintiff does not allege that any of the defendants in this case use any of the furfuryl alcohols in the accused oven cleaner compositions.

139. Shelco introduced Jifoam to the market regionally in New England with a saturation television, radio, and other media advertising campaign. (1120) Over two million dollars were spent in so advertising Jifoam between 1963 and 1966. (799–800) Brochures distributed to the trade in the course of that campaign emphasized the importance of the new "catalyst" contained in Jifoam. An example is contained in DX 523, which reads:

> " 'Jifoam' is a new and radical departure from conventional oven cleaners. *It derives its almost instant cleaning ability from the incorporation of a catalyst* that when heated in admixture with the base to above 140° F saponifies grease and dirt faster than the strongest caustic mixtures on the market." (Emphasis added)

140. Shelco now says that the emphasis on the catalyst in the advertising campaign was merely a "sales gimmick", (1123–24) but it is the frequent use of this type of high budget sales gimmick that makes undiscerning reliance on commercial success a dubious test of invention or unobviousness. In this case, the period of time involved corresponded with an upsurge of housewife demand for convenience packaging of household products generally. (3182–83) The market for aerosol oven cleaners was not created by Plaintiff's product, although consumer interest may have been heightened by Plaintiff's intense advertising campaign. [Plaintiff admitted that similar advertising campaign.] Plaintiff admitted that similar advertising campaigns by the defendants of their products cut deeply into Plaintiff's sales. (1154–56)

141. In view of the above findings, the Court cannot find that any commercial success that Jifoam may have enjoyed was attributable to an inventive feature present in any claim of the patent asserted in this suit, and therefore such commercial success is not relevant to this case.

142. Plaintiff admits that Boyle-Midway does not use propylene glycol (2646), and since Plaintiff also admits that it cannot even show that Boyle-Midway ever did a complete analysis of Jifoam (2645), there is nothing in the record to support to charge that Boyle-Midway "copied" Plaintiff's product.

143. It is undoubtedly true that Jifoam's early success in the New England market did not go unnoticed by Dow's marketing personnel. As Mr. Foster, Dow's Brand Manager, testified, Dow was always seeking to improve its products and to meet or better its competition. (3044–45) It is also true that Dow modified its oven cleaner after Jifoam was on the market. This modified cleaner does not contain furfuryl alcohols and, unlike Jifoam, does contain ammonia. (3042–43) It is not a "copy" of Jifoam.

144. The evidence shows, and Shelco admits, that Dow, in the common practice of monitoring oven cleaner competition, knew of Jifoam in late 1963 (PX 102) and had analyzed Jifoam by early 1964 (PX 104; 2645). Jifoam was one of several oven cleaners being so monitored. (see, e. g. PX 105) Dow's modified oven cleaner was put on the market in 1965. (2645) During the period from 1963 to 1965, as before and after, Dow carried out a systematic research and development program with respect to improvement in oven cleaners. (see, e. g., DX 102; DX 103; PX 94–96; Dow's Answer to Interrogatory 57, 3340–41; PX 117, 119).

145. It is axiomatic that once Dow knew of Jifoam, it subsequent actions cannot be evidence of *"prior* attempts and failures" pertinent to the issue of obviousness. It is also the fact that dozens of the Dow oven cleaning formulations which Shelco says were unsuccessful fall within the claim language of the patent in suit, a matter which will be discussed under the issue of indefiniteness.

146. The evidence shows that while the large national brand companies initially demonstrated reluctance to market a sprayable caustic oven cleaner, the reluctance was market oriented—not formulation or method oriented. It was motivated by consumer concern lest the spray might be inadvertently directed into the user's eyes rather than onto the oven surface (an event which could cause permanent eye damage). (DX 103–05; DX 107–14; DX 578; 1948–49) The market experience of Beam, Dip-Away, Bissell, and most particularly, HEP, demonstrated the acceptability of marketing a spray caustic oven cleaner.

147. Shelco makes much of the fact that Dow criticized Jifoam as being unsafe. (PX 103) The fact is that that criticism was based on a toxicological test run by Dow (DX 99) which showed that Jifoam *did* cause permanent eye damage to the eyes of rabbits and "is a rather severe eye irritant" as well as being "corrosive to the skin." Because of this test and repeated adverse toxicological tests on Jifoam (3061–62; 3599–3600; DX 100, 109; PX 126) and other caustic compositions (DX 102–05; PX 97; PX 115), Dow steadfastly resisted the temptation to market a caustic spray, despite pressure from its marketing personnel. (3620–21) It was not until Dow developed a product that passed the eye tests of its toxicological laboratory in 1965 that Dow permitted the marketing of its modified caustic oven cleaner. (PX 115; PX 132; DX 113) This modified cleaner was not a duplication of Jifoam. Jifoam never passed the toxicological laboratory eye damage tests at Dow. (DX 109)

148. In view of the above findings, the evidence of Defendant's "attempts and failures" relied upon by Shelco are immaterial to the issue of invention of the patent in suit. The attempts were not related to efforts to duplicate any inventive feature of Jifoam—at best they were to avoid shortcomings in the well known spray caustic formulations then used—including those used by Perry.

## OVERCLAIMING

149. The claims of the patent in suit call for the use of "a propellant—sufficient to force said composition [the oven cleaner] out of said [aerosol] container as a spray." (DX 77; Claims 1, 16) Perry told the Patent Office, "—the invention does not lie in any particular kind of propellant so long as it propels." (DX 75, p. 31)

150. Methylene chloride was at the time Perry filed his first application (DX 74) and has continued to be, a propellant used with aerosol containers. (88, 121, DX 3) Freons such as Freon 12 and Freon 114 are also propellants used with aerosol containers. (86–88, DX 3, PX 32) Therefore an oven cleaner and method for using the same, otherwise within the scope of the claims in suit, which has as a propellant methylene chloride, Freon 12 or Freon 114, falls within the scope of the claims in suit.

151. Perry asserts that the use of the conventional propellant ingredient, methylene chloride in the Bissell product, makes Bissell unsuitable for use on a hot oven. (2378–83) This unsupported testimony is contradicted by Dr. Colburn. (89–90) If, however, Perry's testimony is accepted, the claims in suit, all of which include this propellant, are invalid for overclaiming since they cover inoperative subject matter.

152. The same can be said of Plaintiff's criticisms of Dr. Lover's 6–53 formula. The modest leaking problems encountered with the 6–53 formula when using seamed cans are precisely the type of leaking problems encountered by Plaintiff. If Plaintiff's argument that the 6–53 formula (with Freon 12 and

Freon 114) was inoperative (due to the leakers), then the claims in suit, all of which read thereon, are invalid for overclaiming since they cover inoperative subject matter.

153. A number of the claims in suit (DX 77, Claims 2, 5, 19, 28, 31, 32) call for a "surfactant". Perry told the Patent Office, "—nor, does the invention lie in any particular surfactant, so long as it has the surface active properties inherent in surfactants." (DX 75, p. 31) Perry now asserts that the surfactants in the 6–53 formula would not perform as good foaming agents. (2438–2440)

154. This assertion is contradicted by Dr. Lover. (2039–42) If the assertion is accepted, the claims calling for a "surfactant" are invalid for overclaiming since they cover inoperative subject matter.

155. Other claims in suit call for the presence of a "humectant," which can be a glycerol, glycol or any alcohol having more than two hydroxyl groups. (Finding 15) Sullivan's OC No. 1 formula containing Span 80 and Tween 80 are within this meaning and scope of the term "humectant" as it appears in the claims in suit. (3369) If, as Perry contends, the formula would not be suitable for use on a hot oven, the claims which generically call for a "humectant" or "polyhydric alcohol humectant" are invalid for overclaiming since they cover inoperative subject matter.

156. Shelco also contends that dozens of Dow oven cleaner formulations were tried in the lab, but were unsuccessful, for one reason or another. (Pl. Pretrial Brief, pp. 33–35; DX 101–102; PX 117) However, these Dow oven cleaner formulations are within the scope of the claims of the patent in suit. If Shelco's contention with respect to these formulations is accepted, the claims read on inoperative subject matter and are therefore invalid for overclaiming.

156A. It follows from the foregoing (Findings 149–156) that the claims in suit which contain no limitation to a "surfactant" and/or a "humectant" are also invalid for overclaiming (if Plaintiff's contentions of inoperativeness of prior art references are to be accepted) since they read on subject matter which lacks ingredients which Plaintiffs contend are the sine qua non of their invention.

## EVALUATION OF EXPERT TESTIMONY

157. In view of the circumstances of this case, the Court deems it advisable to comment briefly on the nature of the expert testimony presented by the parties.

158. Mr. Perry conceded that the amount of propellant was critical and that the critical amount was different for different propellants. (2691–97) He failed to point this out in the patent application, and therefore did not point out the best method of practicing the invention as required by 35 U.S.C. § 112. He also failed to point out the best method of practicing the invention in that he testified that a particular nozzle was required but did not identify this type of nozzle in the application. (1173–76)

159. Mr. Perry graduated in Chemical Engineering from North Carolina State College in 1940 and then spent the next eleven years with Lever Brothers working on soap, except for a period in the Navy. (952–53) He then formed Winfield Brooks Company, a partnership, (later a corporation) in 1951. (955) In 1961 Mr. Carpenter (President of Shelco) became a preferred stockholder and officer of Winfield Brooks, but was later bought out by Mr. Perry. (1082; 1985–87)

160. The Winfield Brooks Company had a number of early products. Much of the work at Winfield Brooks, as shown by laboratory notebooks, consisted of obtaining a product then on the market and duplicating it or copying it, sometimes at the request of a customer and sometimes otherwise. (1394–1400; DX 82)

161. As a witness at his deposition Mr. Perry avoided questions which involved expert opinion as to what would happen if variations in his oven cleaner

formulation were made: in his deposition he denied ever having carried out an experiment in which he compared the effects of caustic soda and sodium metasilicate (2333); he denied ever having tried sodium metasilicate in an oven cleaner (2334); he denied knowing what would happen if he replaced caustic soda in an oven cleaner with sodium metasilicate (2334); he denied ever having made a test to see whether the action of an oven cleaner was due to OH ions or to un-ionized sodium hydroxide (2337); he denied having made a test to see what would happen if you added sodium silicate to any example of the patent (2337); he denied knowing whether it would make any difference in the activity of the material (2338–39); he admitted that he had nothing in his chemical background which would tell him whether the addition of a silicate to caustic soda would make any difference (2339); he did admit that sodium orthosilicate was a mixture of sodium hydroxide and sodium silicate (2339). In spite of his self-proclaimed ignorance on technical matters closely related to the subject matter of his patent, Perry was selected by Plaintiffs as their sole technical expert. Perry was a highly motivated witness who stands to benefit substantially from a finding upholding the validity of his patent. Under all of the circumstances of this case, the Court feels that Plaintiff's unexplained failure to produce an independent expert to corroborate Perry's otherwise unsupported testimony on technical matters, (in conflict with the testimony of Defendants' experts) seriously detracts from the weight to be accorded Perry's testimony.

162. Perry's lack of knowledge on fundamental, easily-checked matters was striking. He did not know what a glycol was although that is fundamental to his patent. (1260–61) He was even uncertain about what glycerol was. (1262) He was vague on whether sodium orthosilicate was a mixture or a chemical compound. (2355–59; 2508–11) On things not so easily checked he gave many opinions which, when they were checked, were grossly inaccurate. He said that a chelating agent would cause corrosion. (2423–26) This opinion was flatly rejected by Ross who testified that a widely used cleaning material was used in open vessels of mild steel using 3% caustic solution and elevated temperature without causing corrosion, and that the same material was shipped in ordinary steel containers as a 50% caustic solution, even though it contained a substantial portion of sodium gluconate, one of the best chelating agents. (3148–58)

163. Perry testified that mixtures of silicate and phosphate could not be packaged in steel drums in the presence of a chelating agent, (2423–26) but Ross showed that there was a standard military specification for such material in 50-gallon steel drums and that there was no corrosion problem. (3148–58)

164. Perry also testified that the presence of sodium silicate would clog aerosol containers, but he admitted never having tried it, (2353–54) and Burkholder contradicted Perry's blanket statement by showing that the Bissell aerosol oven cleaner, which contained sodium silicate, had been sold for years without such difficulty. (3293)

165. The court finds that Perry's opinions as an expert do not carry weight. On the other hand, Dr. Colburn and Dr. Lazo, who testified as experts for the Defendants, exhibited a firm command of the chemical subject matter about which they were testifying, and demonstrated neither bias nor prejudice. The Court finds their testimony credible and, when in conflict with that of Perry, credits their testimony. While presented as fact, as opposed to expert, witnesses, the Court was also impressed with the chemical expertise and credibility of Dr. Myron Lover and of John J. Sullivan whose testimony was fully in accord with that of Defendants' experts Drs. Colburn and Lazo.

*License to File Foreign Applications*

166. On August 18, 1964, Perry filed a Canadian application, Serial No. 907,-718, (DX 608) and on September 8, 1964, he filed a Great Britain application No.

36735/64 (DX 607). Each of these applications included a claim directed to the alleged invention of a method of using an oven cleaner not restricted to the inclusion of the catalyst.

167. The only foreign license which was ever sought from the Commissioner of Patents and which was ultimately granted, was filed on January 8, 1964 and covered an invention for an oven cleaner restricted to the use of a catalyst. (DX 609) No license to file foreign patent applications including the substance of Claim 11, added by amendment to Perry's first United States application on April 20, 1964, (DX 74, p. 16) was ever sought or obtained. (DX 610)

## FRAUD

168. The patentee, Kenneth E. Perry, at all material times has been president of a small chemical company known as Winfield Brooks Company. (1082) Perry was and is in charge of all technical activities in this company including the wording of the labels on the oven cleaner product (994–96; 2316; 2453–55); he also approves all expenditures of money. (2292–93; 751) Perry claims to have been the inventor of the composition and method of the patent. (DX 74, p. 15; DX 75, pp. 15, 16; DX 76, pp. 17–18).

169. Perry, who resided in the Boston area then and now, states that he made the oven cleaner composition covered by his patent claims (but without the furfuryl alcohols and not in an aerosol container) on one morning, a Saturday, September 15, 1962. (1017; 1390–91; DX 81; DX 88) This is said to be shown by a single notebook entry of the formula allegedly made by Perry on that date. (DX 81) No other documentary evidence of the invention has been offered. No variations in arriving at this formula are shown, as would be characteristic of one working out a problem. No comparative tests are shown, nor were any preferred ranges suggested or tested.

170. During 1960 and 1961, Winfield Brooks worked on various paste-type oven cleaning formulations, none of which were put on the market. (DX 80; 1364–69) There is no record of any work on any oven cleaners being done at Winfield Brooks between early 1961 and September 15, 1962.

171. The Beam oven cleaner was sold in the Boston area beginning in 1959 and continuing through at least all time periods relevant to this suit. (DX 28–32; DX 35A–50; 701–02) One of the distributors of the Beam oven cleaner in the Boston area, beginning in the summer of 1962, was one Fred Hannon. (374–76; 709–11) Hannon was supplied with the Beam oven cleaner in gallon containers and in the squeeze bottles represented by DX 24. (722–23; 768) He was also supplied with literature describing the product and its method of use. (400–01) In September, 1962, Hannon called on Perry in response to Perry's advertisement for a salesman. (1356–58) The job had been filled, but, according to Perry, Hannon "was a pretty good salesman and he saw what we were doing, so he talked his way into representing some of our industrial products." (1002) Hannon worked on a part-time basis from September, 1962 until February 17, 1963 when he became a full-time salesman. (1358–59)

172. On September 15, 1962, the composition formula shown in the Example of the patent in suit, except for the furfuryl alcohols (which were not in the Beam oven cleaner), appeared in Perry's notebook, despite the fact that no work had been done on oven cleaners by Perry for over a year and a half previously. (1009–17; PX 133, pp. 109–11) On Monday, September 17, 1962, before any sales had been made by Hannon, he received his first payment from Perry (said to be an "advance"). (DX 90; 2479)

173. The Beam oven cleaner had been sold, prior to September, 1962, in the Boston area and elsewhere, by Hannon and others, under the name Beam "Wipe Away" Oven and Grill Cleaner. (Finding 171) The heading on the September 15, 1962 notebook entry of Perry's formula reads, "Formulate 'Wipe Off' Type

Grill and Oven Cleaner". (DX 81) There is no evidence of any product other than Beam sold under a similar name. There are multiple instances read into the record from Perry's notebooks which show a practice at Winfield Brooks of copying, duplicating, matching, or formulating products of others identified by their trade name. (1394–1400; DX 82).

174. In October, 1962 and January, 1963, some 220 gallons of the September 15 formula oven cleaner were produced by Perry. (DX 82; 1023–27) 30 gallons were shown to have been sold in October, 1962. (821; DX 83A; DX 83B) No sales records appear for the remaining 190 gallons, but Perry testified that at least some of this cleaner was packaged in plastic squeeze bottles and given away for demonstrations. (1404–08; 821)

175. For example, in January 1963, Winfield Brooks sent to a home economist in the Boston area, Mrs. Dorothy Hall, several plastic squeeze bottles of an oven cleaner, first made by Winfield Brooks after September 15, 1962 and known as "Winbro 403". (821; 641–46) Mrs. Hall was given a Winfield Brooks Product Data sheet covering this product in February 1963. (DX 54; 649–50)

176. The Winfield Brooks Product Data sheet contains three paragraphs setting out the method of use of the oven cleaner. These directions (55 words) are identical word-for-word, with the directions on the Beam label used prior to 1962. The list of 14 uses for the oven cleaners are also word-for-word, identical, the only difference being that the Product Data sheet has the uses arranged in vertical columns. (Compare DX 54 and DX 24 or DX 19) These three paragraphs are as follows:

1. "Hold bottle upright and squeeze to spray liquid on soiled surfaces. Works faster on warm surfaces. (Non-inflammable)

2. Wipe clean with damp cloth when soil is soft, time may be 5 to 20 minutes depending on amount of soil.

3. Can be used for soaking purposes by adding 3 oz. to each gallon of hot water."

177. Perry testified that he was not the one who copied the Beam label and that he did not know of the copying, or even the existence of Beam before this suit was filed. (1041–43)

178. Perry's testimony must be considered in the light of his personal and financial interest in the outcome of this litigation. One of the contingencies of the sale of Shelco assets to the Clorox Company is that Messrs. Perry and Carpenter (President of Shelco, Inc.) will receive many thousands of additional shares of Clorox stock if their patent is sustained. (1129–30; 2477) Perry's testimony must also be considered in light of other testimony. A) He was the only person at Winfield Brooks with authority to authorize labels, etc., in 1962. (2453–55) B) Carpenter testified that he was aware of Beam in 1963 and that he saw it in gallon containers before July 1963 and in small ("possibly 8 oz.") plastic bottles after July 1963; (814–15; 1097) that it was his practice to send competing products to Winfield Brooks for evaluation. (1099) C) Hannon, who was an evasive witness on deposition, testified that he "could have" talked to Perry about Beam. (775–76) D) Buck, who was a chemist employed by Winfield Brooks at the time of the alleged Perry invention testified that Hannon told him about a liquid oven cleaner for spraying on a hot oven in the summer or early fall of 1962 and that Beam was not unknown at Winfield Brooks.

179. The court finds the evidence persuasive that Hannon revealed the Beam cleaner, its application to a hot oven, and its successful commercial acceptance by the public to Perry and that by a cursory examination of the produce, a chemist such as Perry could determine that it was an aqueous sodium hydroxide solution. Seljan, in fact, did so duplicate Beam. (857)

180. In spite of the facts that the directions for use (method) of Perry's oven cleaner had been directly copies

from Beam, and that Beam was an aqueous caustic which could be easily analyzed, the existence of Beam was kept from the Patent Office by Perry and Shelco or its predecessors. Repeatedly, throughout the prosecution of the patent, the Patent Office was told that there was *no* teaching in the prior art of applying an aqueous caustic oven cleaner to a hot oven. (Finding 20) In addition to knowledge of Beam by both Perry and Carpenter, it is clear from a memorandum written on October 7, 1966 by Perry's Washington patent counsel that Perry was aware that Perlman in his '409 patent application had taught the use of a caustic oven cleaner on a heated oven surface. (DX 86, p. 30). This knowledge, despite express representations to the contrary made to induce patent allowance, was withheld from the patent examiner responsible for Perry's application who was never made aware of the full facts known to Perry.

181. The original Perry oven cleaner produced after Hannon's visit was not sold in aerosol cans. Perry at first denied any knowledge of the use of his oven cleaner in squeeze bottles of the Beam-type, but later admitted that there were ample supplies of these bottles available and that they may well have been filled with oven cleaner and given away, particularly to Vaughn Electric Company in the Boston area. (Findings 174; 175)

182. The response achieved by Vaughn Electric from the dispensing of the original formula in conventional pressure atomizers was favorable, and it was Vaughn Electric that suggested, at least by February 13, 1963, that the product be packaged in aerosol containers. On February 13th (DX 58), Vaughn Electric actually ordered 100 cases of such aerosol-packaged material. The invoice covering this order was not found in Perry's files, although the evidence shows that such files were carefully maintained at Winfield Brooks. The invoice came to light only through the testimony of Mr. Matthews of Vaughn Electric Co., who produced Vaughn's copy of the invoice. (3018–3021)

183. Four days after the receipt of the Vaughn Electric order, and the suggestion of the use of an aerosol package, Hannon was made a Sales Manager of Winfield-Brooks at a salary of $10,000 a year. No one connected with Perry has asserted a conception date prior to February 13, 1963 for packaging the oven cleaner of Winfield Brooks in an aerosol container. Carpenter admitted that the suggestion for an aerosol container came from Vaughn Electric. (1088–89; 1158) Perry's testimony on the point can at best be described as at least ambiguous. There is absolutely no showing that an oven cleaner without the furfuryl alcohols was ever packaged by Perry in an aerosol container prior to December 3, 1963. Perry's written invention disclosure to his attorney (DX 63) indicates that Perry considered everything but the addition of the furfuryls to be old or inoperative. As late as June 10, 1964, Perry had communicated no disclosure of any oven cleaner without catalyst to his patent attorney. (DX 67)

184. There are no records showing any experimentation in packaging Perry's material in aerosol containers, nor of any problem in the selection of the proper type of container, propellant or valve. If there were any such problems, not only are there no records, but the patent itself is completely silent as to what type of container, what kind of valve, or what type of or proportioning of the propellant might be essential. Neville, part owner of Shield Chemical Company (aerosol packager for Perry), who would not be expected to give testimony biased in favor of Defendants, testified unequivocally that it was Carpenter and another, unnamed (contended by Defendants to be Hannon, and definitely not Perry), who first brought the oven cleaner composition to Shield for aerosol packaging. (1427–28). This was quite definitely in the first several months of 1963. (1429, 1489). This corroborates the Court's finding that Perry contribut-

ed nothing to the subject matter of the claims in suit other than his version of the Beam formula. The idea for aerosol packaging was contributed by Vaughn, and carried into effect by Carpenter and the unidentified companion of Carpenter; and the details of aerosol packaging were contributed by Shield Chemical Company. (1530–32).

185. The earliest date of which there is any record, or corroborated testimony, for the manufacture of the oven cleaner in an aerosol container by or for Perry is about March 13, 1963. (PX 58–62) There is no earlier date of conception proven, since the only earlier activity is evidenced by Carpenter carrying out the wishes of Vaughn Electric for an aerosol container and this cannot be considered as the conception of Perry. The fact of invention by Perry is not and cannot be corroborated on the existing record.

186. In addition to the above material misrepresentations to the Patent Office and to this Court, other material misrepresentations were made to the Patent Office.

187. At an interview following the final rejection of all claims by the patent examiner, in which Perry personally participated, the examiner requested formal proof of the safety of the oven cleaner. (DX 76, p. 179) Tests were run, paid for by Shelco and the patentee, and those test results considered favorable were submitted to the Patent Office. (DX 76, pp. 180–86)

188. The examiner accepted and relied upon the test results submitted, as evidenced by a memo written by Perry's Washington counsel, and subsequently allowed the patent. In the words of the Washington counsel, the examiner stated, "it was really the affidavits [on safety] that resulted in the favorable disposition of this case." (DX 68)

189. The examiner was unaware of the fact that Perry and Shelco had obtained other, adverse test results (the Foster D. Snell reports, obtained at a cost of about a thousand dollars, 1333; DX 520–522) which indicated that the oven cleaner was a primary skin and eye irritant. He was not aware of this fact because it had been decided, again as shown by a memo from Perry's Washington counsel, that the adverse report which showed eye damage and severe irritation of all skin test sites might "offset the advantages" gained from the reports that were considered favorable and that therefore the adverse reports should be consciously and deliberately withheld. (DX 71; production pages 3035–36)

190. At the time the allegedly favorable test reports were submitted to the Patent Office in response to the examiner's requirement for proof of safety, (DX 76, p. 179) Shelco had received at least 38 customer complaints of personal injury resulting from the use of this same oven cleaner. (DX 524) No mention was made of these letters although foam were submitted to the Patent Office letters considered complimentary of Jifice (DX 76, pp. 157–165).

191. Perry also conducted certain tests on compositions set forth in the Perlman '408 and '409 patents and their commercial embodiment, HEP, for the purpose of persuading the Patent Office that Perry's produce was superior to the HEP oven cleaner. In an affidavit of March 24, 1966, Perry stated that he had followed the teaching of the Perlman patents as to the formulae and procedures to be used. (1217; DX 75, p. 36) These tests of the Perlman compositions were conducted on a hot oven, with the reported result that the cleaning efficacy was poor compared to Jifoam. (DX 75, pp. 36–37) Perry did not tell the Patent Office, though he admitted the fact at trial, that he had *not* followed the instructions of the patent which specifically state that the oven surfaces should be thoroughly wetted before application of the cleaner, (1226–27) nor did he inform the Patent Office that he had specifically avoided using any examples from the Perlman patents which contained glycol numectants—a feature that Perry now claims gives his produce remarkable advantages. (1227–29)

192. Perry did not disclose to the Patent Office the sale or public use of his Winbro 403 formulation more than a year prior to his application date even though he stated in his application that the action of a "conventional pressure atomizer" produced precisely the same results as those produced by an aerosol container (Finding 18) and even though on April 20, 1964 he broadened his disclosure by inserting a claim which directly covered such a product. (Finding 28) Neither did he tell the Patent Office of the prior sale of Instant-Off in aerosol cans to Vaughn Electric in March, 1963,[6] in response to an order placed by Vaughn Electric on February 13, 1963. (DX 58) The oven cleaner sold, contained the composition set forth in Finding 12 (822; DX 82).

193. Perry deliberately withheld critical information from the Patent Office including the damaging Foster D. Snell Reports (DX 520, 521) and all information relating to the Beam Oven Cleaner which taught the use of an aqueous caustic surfactant humectant spray oven cleaner on a hot oven. (Findings 169–182) Perry deliberately withheld from the Patent Office the full manner in which he conducted the comparative tests of the oven cleaner taught by the Perlman patents. (Finding 192) As a result, the examiner was intentionally and materially deceived as to the state of the prior art at the time of the alleged invention and as to the asserted safety and superiority of Perry's product over the prior art.

194. This suit has been brought and maintained in a bad faith attempt to enforce a patent which Shelco knew or reasonably should have known was obtained as a result of fraud or material misrepresentations knowingly and deliberately made to the Patent Office.

195. This case is an exceptional case within the meaning of 35 U.S.C. § 285, justifying the awarding of reasonable attorney fees and expenses to Defendants.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of the parties and subject matter of this action.

█ 2. A patentee must be an inventor and he must have made a discovery.

Thompson v. Boisselier, 114 U.S. 1, 5 S.Ct. 1042, 29 L.Ed. 76

Gardener v. Herz, 118 U.S. 180, 6 S. Ct. 1027, 1033, 30 L.Ed. 158 (1886)

█ 3. An invention, to be patentable, must be novel, useful and not obvious.

35 U.S.C. §§ 101, 102, 103

Graham v. John Deere Co., 383 U.S. 1, 12, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966)

█ 4. Under 35 U.S.C. § 102, a patent may be found invalid as being anticipated by the prior art even though not every element of the claimed invention is found in a single piece of prior art, provided the differences between the claimed invention and the prior art are immaterial differences which are mere matters of choice not of inventive significance.

Frantz Mfg. Co. v. Phenix Manufacturing Co., Inc., 307 F.Supp. 822 (E.D. Wisc., 1970)

Tool Research and Engineering Corp. v. Honcor Corp., 367 F.2d 449, 454 (9th Cir., 1966)

█ 5. Under 35 U.S.C. § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art is to be resolved. Against this background, the obviousness or unobviousness of the subject matter is to be determined.

Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966)

---

6. This sale was more than one year before the filing of the broadening amendment (DX 74, p. 15) on April 20, 1964.

Appleton Electric Co. v. Efengee Electrical Supply Co., 412 F.2d 579, 582 (7th Cir., 1969)

Gass v. Montgomery Ward & Co., 387 F.2d 129, 129–130 (7th Cir., 1967)

Deep Welding, Inc. v. Sciaky Bros., Inc., 417 F.2d 1227, 1232–1233 (7th Cir., 1969)

■ 6. 35 U.S.C. § 112, requires that a disclosure of the invention, as defined in the claims, be in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains to make and use it. It further requires that the patentee must disclose his best method and composition. If he fails to do so, or the claims are so broad as to cover inoperative subject matter, the patent is invalid for indefiniteness and for over claiming.

Permutit Co. v. Graver Corp., 284 U.S. 52, 60, 52 S.Ct. 53, 76 L.Ed. 163 (1931)

Halliburton Oil Well Cementing Co. v. Walker, 329 U.S. 1, 13, 67 S.Ct. 6, 91 L.Ed. 3 (1946)

Graver Tank & Mfg. Co. v. Linde Air Prod. Co., 75 U.S.P.Q. 231, aff'd. 336 U.S. 271, 69 S.Ct. 535, 93 L.Ed. 672 (1949)

Deep Welding, Inc. v. Sciaky Bros., Inc., 417 F.2d 1227 (7th Cir., 1969)

Pemco Products, Inc. v. General Mills, Inc., 261 F.2d 302 (6th Cir., 1958)

Libbey-Owens Ford Glass Co. v. Celanese Corporation, 135 F.2d 138 (6th Cir., 1943)

■ 7. The *claims* of a patent are the sole measure of the grant.

Aro Mfg. Co. v. Convertible Top Replacement Co., 365 U.S. 336, 339–340, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961)

Universal Oil Prod. Co. v. Globe Oil & Refining Co., 322 U.S. 471, 484–485, 64 S.Ct. 1110, 88 L.Ed. 1399 (1944)

Milcor Steel Co. v. George A. Fuller Co., 316 U.S. 143, 145–146, 62 S.Ct. 969, 86 L.Ed. 1332 (1942)

■ 8. Claims of a patent which fail to include one or more elements essential or critical to practice the invention are invalid.

Permutit Co. v. Graver Corp., 284 U.S. 52, 58, 52 S.Ct. 53, 76 L.Ed. 163 (1931)

Technograph Printed Circuits Ltd. v. Bendix Aviation Corp., 218 F.Supp. 1, 44 (D.Md., 1963), aff'd. per curiam, 327 F.2d 497 (4th Cir., 1964)

■ 9. A patent claim may not be given a narrow construction consistent with the disclosure of the patent to avoid the prior art or establish patentable invention and then be given a broad construction to embrace an accused device.

Graham v. John Deere Co., 383 U.S. 1, 33, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966)

Skirow Bros. v. Roberts Colonial House, Inc., 361 F.2d 388, 391 (7th Cir., 1966)

■ 10. The presumption of validity of a patent is rebuttable and may be destroyed where, as here, pertinent prior art relied upon by the defendants was not considered by the Patent Office.

Appleton Electric Co. v. Efengee Electrical Supply Co., 412 F.2d 579, 581 n. 4 (7th Cir., 1969)

Novo Industrial Corp. v. Standard Screw Co., 374 F.2d 824, 827 (7th Cir., 1967)

■ 11. The presumption of validity of a patent is weakened upon a showing of intentional or unintentional misstatements concerning the prior art made in the patent application or in prosecuting the application before the Patent Office.

Amerline Corp. v. Cosmo Plastics Co., 271 F.Supp. 215, 230 (D.Ill., 1967), aff'd. 407 F.2d 666 (7th Cir., 1969)

■ 12. Courts should scrutinize combination patent claims with care proportioned to the difficulty and improbability of finding invention in an assembly of old elements, especially where all

of the claims of the patent in suit are directed to a combination which merely unites old elements with no change in their respective functions and which results in no effect greater than the sum of the effects of the elements taken separately.

Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 152–153, 71 S.Ct. 127, 95 L.Ed. 162 (1950)

Anderson's-Black Rock, Inc. v. Pavement Salvage Co., Inc., 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969)

Continental Can Company v. Old Dominion Box Company, 393 F.2d 321 2nd Cir., 1968)

■■ 13. It is a well established principle that a mere carrying forward of a thought, a change only in form, proportions or degree, the substitution of equivalents which do the same thing in the same way, by substantially the same means, with better results, is not such an invention as will sustain a patent.

Smith v. Nichols, 21 Wall. 112, 119, 22 L.Ed. 566 (1875)

Schreyer v. Chicago Motor Coil Corporation, 118 F.2d 852 (7th Cir., 1941)

B. F. Sturtevant Co. v. Massachusetts Hair & Felt Co., 122 F.2d 900, 907 (1st Cir., 1941)

Fowler v. Sponge Products Corp., 246 F.2d 223, 226 (1st Cir., 1957)

■■ 14. The production of a more efficient, useful and convenient article consisting of the adaptation of old and well known elements which does not involve the exercise of uncommon talents is not patentable invention.

Anderson's-Black Rock, Inc. v. Pavement Salvage Co., Inc., 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969)

Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 153, 71 S.Ct. 127, 95 L.Ed. 162 (1950)

■■ 15. Mere improvement in result does not make patentable that which otherwise would not be patentable.

Anderson's-Black Rock, Inc. v. Pavement Salvage Co., Inc., 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258

Graham v. John Deere Co., 383 U.S. 1, 36, 86 S.Ct. 684, 15 L.Ed.2d 545 (1965)

■■ 16. Even though it be assumed that the product of a patent filled a long felt need in the industry, that it met with great commercial success, and was copied, these facts alone could not impart patentability to a claim which is lacking in patentable invention.

Great Atlantic & Pacific Tea Co. v. Supermarket Equip. Corp., 340 U.S. 147, 153, 71 S.Ct. 127, 95 L.Ed. 162 (1950)

Anderson's-Black Rock, Inc. v. Pavement Salvage Co., Inc., 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969)

Milton Mfg. Co. v. Potter-Weil Corp., 327 F.2d 437 (7th Cir., 1964)

Goldman v. Bobins, 245 F.2d 840 (7th Cir., 1957)

Circle S. Products Co. v. Powell Products Co., 174 F.2d 562 (7th Cir., 1949)

■■ 17. Commercial success of a device is irrelevant to the question of validity unless the specific features claimed in a patent are proved to be the cause of the commercial success.

Jungersen v. Ostby & Barton Co., 335 U.S. 560, 567, 69 S.Ct. 269, 93 L.Ed. 235 (1949)

Endevco Corp. v. Chicago Dynamic Industries, Inc., 268 F.Supp. 640 (N.D. Ill., 1967)

T. P. Laboratories, Inc. v. Huge, 371 F.2d 231 (7th Cir., 1966)

Schreyer v. Chicago Motorcoil Corp., 118 F.2d 852 (7th Cir., 1941)

■■ 18. The uncorroborated testimony of an interested witness may be disregarded when it relates to the subject matter of his interest and is contradicted by other, disinterested testimony, including strong circumstantial evidence.

Girardi v. Gates Rubber Co., 325 F.2d 196 (9th Cir., 1963)

19. Circumstantial evidence may be more certain, satisfying, and persuasive than direct testimony.

Michalic v. Cleveland Tankers, 364 U.S. 325, 330, 81 S.Ct. 6, 5 L.Ed. 2d 20 (1960)

Gearhardt v. American Reinforced Paper Co., 244 F.2d 920, 922 (7th Cir., 1957)

20. 35 U.S.C. § 120 requires that a revised application, to obtain the benefit of the filing date of the patent, must be supported by disclosure in the patent which meets the tests of 35 U.S.C. § 112.

Schriber-Schroth Co. v. Cleveland Trust Co., 305 U.S. 47, 59 S.Ct. 8, 83 L.Ed. 34 (1938)

General Foods Corp. v. Perk Foods, 419 F.2d 944 (7th Cir., 1969)

21. Claims 1–6, 14, 16–19, 26 and 28–32 of U. S. Patent No. 3,335,092 are invalid under 35 U.S.C. §§ 102, 103, 112.

22. U. S. Patent No. 3,335,092, and all claims thereof, is invalid under 35 U.S.C. §§ 184, 185.

Beckmen Instruments, Inc. v. Coleman Instruments, Inc., 338 F.2d 573 (7th Cir., 1964)

23. The complaint herein is dismissed with costs to defendants.

24. The counterclaims for a declaration of invalidity herein are granted.

25. This is an exceptional case within the meaning of 35 U.S.C. § 285 and defendants are awarded their reasonable attorneys' fees and expenses herein.

Blanc v. Spartan Tool Co., 168 F.2d 296 (7th Cir., 1948)

Townsend Co. v. M. S. L. Industries, 143 P.Q. 352 (N.D.Ill., 1964), aff'd. 359 F.2d 814 (7th Cir., 1966)

Uarco Inc. v. Moore Business Forms, Inc., 306 F.Supp. 369 (N.D.Ill., 1969)